OPINION OF THE COURT
Fuchsberg, J.
This action, for money damages and injunctive relief, arises from the New York Times Magazine’s nonconsensual publication of plaintiff Clarence W. Arrington’s photograph as the most prominent illustration of a feature article entitled “The Black Middle Class: Making It”. The magazine, a part of the Sunday edition of The New York Times, is circulated widely throughout city, State, and Nation, and elsewhere. The picture, apparently taken while Arrington was walking along a street in New York City, was prominently displayed across the cover of the publication. Arrington, whose name was not mentioned in the article, had no prior knowledge that the photograph had been taken, much less that it would be sold or published or that it would be used in connection with this or any other article. These facts are unquestioned.
Defendant The New York Times Company (hereinafter the Times), which published the article, in its brief describes it as a commentary on “the role of the expanding black middle/professional class in today’s society”, in the course of which, among other things, its author concludes that “this group has been growing more removed from its less fortunate brethren.” Arrington, a young financial analyst, who then plied his profession with General Motors and now pursues it with the Ford Foundation, regards the text of the article not only as controversial but as one expressive of views he does not credit or practice. Moreover, as he alleges in this action, he and readers who knew him found it “insulting, degrading, distorting and disparaging” not only of black persons of “middle class” status generally but also of himself, as its supposed exemplar, in particular. This, he goes on, subjected him to public scorn *438 and ridicule, principally either because others quite reasonably took the article’s ideas to be ones he shared or because it was assumed that he at least in part had changed his vocation to that of professional model.
Plaintiff’s complaint, sounding in tort, was predicated on three theories: violation of sections 50 and 51 of New York’s Civil Rights Law,[1] invasion of common-law right of privacy and a similar imposition on a constitutional right to privacy. Other than the publisher, joined as defendants were Gianfranco Gorgoni, a free-lance photographer who took the picture at the behest of the Times, Contact Press Images, Inc., the photographic agency which allegedly handled the financial arrangements under which Gorgoni did so and Robert Pledge, Contact’s president.^ In due course, all four defendants moved under CPLR 3211 (subd [a], par [7]) to dismiss the complaint for failure to state a cause of action.
Special Term was of the view that sections 50 and 51 will not support a charge of “actionable commercial exploitation where the picture is published in connection with an article of general interest”. On that premise, plus the . additional rationale that in the end it was the Times alone and not its three codefendants who were “responsible for the publication [and placement] of the picture”, it dismissed against all the defendants. Nevertheless, in obeisance to what it sensed was'an emerging “right to be let alone, sometimes referred to as [a] constitutional right of[1] privacy”, it granted plaintiff leave to serve an amended complaint against the Times on grounds other than those spelled out by sections 50 and 51.
*439 On cross appeals by Arrington and the Times, the Appellate Division, finding no decisional support for the existence of a common-law right of privacy and that the circumstances here do not come within the orbit of any constitutional protection, modified on the law by deleting the leave to amend; Justice Kupferman, in a sole partial dissent, relying on Prosser on Torts (4th ed, pp 812-813), thought Arrington had spelled out a cause of action for having been placed in a “false light in the public eye”. On the present appeal, though, contrary to the holdings below, we believe the case should proceed against the individual defendants, we are of the view that the result reached as to the Times was correct.
Our analysis may well begin with sections 50 and 51. Facially, these statutes simply ban the use “for advertising purposes, or for the purposes of trade” of the name, portrait or picture of a living person unless that person’s written consent has first been obtained. Yet, in light of the decisional event which led directly to their adoption, what their seemingly uncomplicated texts affirmatively provide must be said to have been overshadowed by what these do not say.
The statutory scheme was enacted as a direct response to Roberson v Rochester Folding Box Co. (171 NY 538). In this oft-cited case, some 25,000 reproductions of a photograph of the infant plaintiff were distributed throughout the country without her knowledge or consent in order to advertise defendant’s flour. Most significantly, in sustaining a demurrer to so much of the complaint as was framed in terms of a violation of an alleged right to privacy, the court broadly denied the existence of such a cause of action under New York common law. It is noteworthy, therefore, that, while concern engendered by this decision prompted the Legislature to enact sections 50 and 51, these were drafted narrowly to encompass only the commercial use of an individual’s name or likeness and no more. Put another way, the Legislature confined its measured departure from existing case law to circumstances akin to those presented in Roberson. In no other respect did it undertake to roll back the court-pronounced refusal to countenance an action for invasion of privacy.
*440 Nor has the Legislature chosen to enlarge the scope of sections 50 and 51 in the fourscore years since Roberson was handed down. This despite the court’s consistent adherence to its position that, as such, in this State “there exists no so-called common-law right to privacy” (Cohen v Hallmark Cards, 45 NY2d 493, 497, n 2; see, also, Wojtowicz v Delacorte Press, 43 NY2d 858; Gautier v Pro-Football, Inc., 304 NY 354, 358).
Moreover, this narrow reading of the statutory provisions has not been without sensitivity to the potentially competing nature of the values the Legislature, on the one hand, served by protecting against the invasion of privacy for purposes of “advertising” or “trade” and, on the other, the values our State and Federal Constitutions bespeak in the area of free speech and free press. Thus, we not too long ago reiterated that “ ‘[a] picture illustrating an article on a matter of public interest is not considered used for the purposes of trade or advertising within the prohibition of the statute * * * unless it has no real relationship to the article * * * or unless the article is an advertisement in disguise’ ” (Murray v New York Mag. Co., 27 NY2d 406, 409 [magazine cover photograph illustrating a feature story], quoting from Dallesandro v Holt & Co., 4 AD2d 470, 471, app dsmd 7 NY2d 735). And this holds true though the dissemination of news and views is carried on for a profit or that illustrations are added for the very purpose of encouraging sales of the publications (see Pagan v New York Herald Tribune, 26 NY2d 941, affg 32 AD2d 341, 343; Callas v Whisper, Inc., 198 Misc 829, affd 278 App Div 974, affd 303 NY 759; Oma v Hillman Periodicals, 281 App Div 240, 244; Paulsen v Personality Posters, 59 Misc 2d 444, 447-448 [Frank, J.]; Lahiri v Daily Mirror, 162 Misc 776 [Sheintag, J.]).
Now it can hardly be questioned that the article in this case, dealing as it does with the circumstances and tensions incident to yet another example of the mobility our country prides itself on encouraging within and among our societal groups, relates to a subject of “public interest”, clearly a term to be freely defined (see Lahiri v Daily Mirror, supra, at p 782). Accepting that proposition, plaintiff nevertheless seeks to bring himself within the “no real *441 relationship” exception referred to in our Murray decision. To this end, he does not deny that, by external and objective criteria, such as race, educational background, professional status, personal poise and habit of dress, he may be perceived to be a member of “the black middle class”. Indeed, he does not dispute that the picture used by the Times portrays no more than what one might expect an upper or “middle class” man of good taste and attire, whatever the color of his skin, to look like.
Plaintiff’s emphasis, rather, is on the fact that, as he reads it, the article depicts the “black middle class” as one peopled by “materialistic, status-conscious and frivolous individuals without any sense of moral obligation to those of their race who are economically less fortunate”, a conception of the “class” with which he disclaims any “legitimate connection”.[2] While the concededly innocuous title of the article is superimposed over part of the picture (as is the title of another on Christmas pleasures), nothing of the ideas with which he wishes to disassociate himself appear at this point. And, though the article itself gives the names and quotes the statements and opinions of persons whom the author interviewed, as indicated earlier, the plaintiff is neither mentioned, nor are any of the ideas or opinions it expresses attributed to him. The asserted lack of a “real relationship” boils down then, to his conviction that his views are not consonant with those of the author. But this disagreement cannot extend the compass of sections 50 and 51 for, in such matters, it would be unwise for us to essay the dangerous task of passing on value judgments based on the subjective happenstance of whether there is agreement with views expressed on a social issue.
No more persuasive is plaintiff’s perfectly understandable preference that his photograph not have been employed in this manner and in this connection. However, *442 other than in the purely commercial setting covered by sections 50 and 51, an inability to vindicate a personal predelection for greater privacy may be part of the price every person must be prepared to pay for a society in which information and opinion flow freely.
For related reasons, plaintiff’s “false light” formulation[3] cannot save his complaint. There has been serious concern that, by sidestepping the safeguards which restrain the reach of traditional public defamation litigation, a false light approach could compromise the constitutional guarantee of freedom of the press (see Prosser, Torts [4th ed], p 813; Restatement, Torts 2d, § 652E, Comment d, particularly p 399; Wade, Defamation and the Right of Privacy, 15 Vand L Rev 1093, 1121). Responsively, the Restatement, which in 1933 suggested that to impose liability under the false light rubric a publication need but be “offensive to persons of ordinary sensibilities” (Restatement, Torts, § 867, Comment d), by 1976 had raised the threshold to a “highly” offensive level (Restatement, Torts 2d, § 652E, Comment c). Suffice it here.that, even assuming, but not now deciding, that such an action is cognizable in this State, by no means does this case measure up to this kind of criterion.
However, while plaintiff’s complaint therefore was properly dismissed as a matter of law insofar as it purported to proceed against the Times, at this stage it cannot be said that plaintiff has no claim under these statutes against defendants Gorgoni, Pledge or Contact.
In this connection, it must be remembered that the motion to dismiss, one made under CPLR 3211 (subd [a], par 7), was never converted by notice to one for summary judgment as permitted by CPLR 3211 (subd [c]). In this procedural posture, the allegations of a complaint, supplemented by a plaintiff’s additional submissions, if any, must be given their most favorable intendment (see Rovello v Orofino Realty Co., 40 NY2d 633). The complaint here, aside from reciting facts as to the publication of the *443 photograph and plaintiff’s ensuing damages, in substance alleges that Gorgoni took the picture; that Contact, in the business of buying and selling reproduction rights of photographs, had then been commissioned by Gorgoni to sell his pictures; that Pledge was the Contact officer and employee through whom Contact, acting for Gorgoni, sold the Times the picture, the proceeds being divided between Contact and Gorgoni.
True, the affidavits and exhibits these defendants submitted in support of the motion denied important aspects of the roles plaintiff ascribed to Contact and Pledge, but this did no more than create issues of fact. After all, unlike the position of the Times, none of the other three defendants played the part of publisher of the article which plaintiff’s photograph accompanied. Were the plaintiff to establish the truth of his allegations, the acts in which one or more of these defendants will have been proved to have engaged will, plainly and simply, have included that of a nonconsensual selling of the photograph. Thus, operating independently from the publisher, each at that point would have “commercialized the photograph” in “furtherance of [his] trade” (Holmes v Underwood & Underwood, 225 App Div 360, 362). That the sale was to a publisher of news and articles on matters of public interest would not, in and by itself, have clothed these defendants with the publisher’s immunity from the reach of sections 50 and 51. Consequently, the motion to dismiss the complaint to the extent that it pleads a violation of sections 50 and 51 on the part of each of these three defendants should have been denied.
The statutory claims behind us, and the unavailability of those sounding in common-law privacy apparent, we now turn to the plaintiff’s attempt to advance still another cause of action, posited this time on alleged abridgment of a constitutional right to privacy. To that end, no more need here be said than that, since no State action is involved, plaintiff’s constitutional claim must fail.
Accordingly, the order of the Appellate Division should be modified, with costs to plaintiff against defendants Contact Press Images, Inc., Robert Pledge and Gianfranco Gorgoni, in accordance with this opinion, and, as so modi *444 fled, it should be affirmed, with costs to defendant The New York Times Company against plaintiff.

. Section 50 reads as follows: “A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor”.
Section 51, as amended last in 1921 (L 1921, ch 501) makes a violation of section 50 actionable in a civil suit. It specifically provides, as relevant to this case, that “Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person’s name, portrait or picture in such manner as is forbidden or declared to be unlawful by the last section, the jury, in its discretion, may award exemplary damages.”

. Without in any way detracting from the reasonableness of the impression gathered by the plaintiff from his evaluation of the article as a whole, we note that its aúthor, William Brashler, also expressed the opinion that “some of the ‘haves’ in the new black middle class are keeping up the fight, trying to find jobs for black kids, keep them out of trouble, deal with drugs, teach some skills, make black life for poor blacks bearable, offset the lure of the hustle. Every city in the country has its private and public agencies * ** * full of sharp, dedicated, mostly middle-class black staffers and volunteers”.

. (1 Street, Foundations of Legal Liability, p 319; Prosser, Privacy, 48 Cal L Rev 383, 398, 400; Wigmore, Right Against False Attribution of Belief or Utterance, 4 Ky LJ [No. 8] 3; Wade, Defamation and The Right of Privacy, 15 Vand L Rev 1093,1094,1120; McKenna, False Light: Invasion of Privacy, 15 Tulsa LJ 113, 114.)