CATHY DAVIS, Respondent, v HIGH SOCIETY MAGAZINE, INC., et al., Appellants.

Second Department, December 20, 1982

### APPEARANCES OF COUNSEL

*Abelman, Frayne & Rezac (Jonathan L. Rosner* of counsel), for appellants.

*Melvin Paul Spivak* for respondent.

### OPINION OF THE COURT

GIBBONS, J.

Plaintiff, Cathy Davis, has brought this action for damages alleging that defendants have violated her right of privacy under sections 50 and 51 of the Civil Rights Law, and have misappropriated her "right of publicity". According to her complaint plaintiff is a well-known professional boxer, being "the first woman to become a licensed boxer" and "the lightweight women's boxing champion". The complaint also states that she has become a "radio and televi-

sion personality". The defendants, High Society Magazine, Inc. and Dorjam Publications, Inc., publish a magazine called *Celebrity Skin* which, as described in defendants' brief, "specializes in printing photographs of well-known women caught in the most revealing situations and positions that the defendants are able to obtain" (see *Ann-Margaret v High Soc. Mag.,* 498 F Supp 401, 403).

Page 84 of the third edition of *Celebrity Skin* contains three photographs depicting women in pugilistic positions. Two of the pictures appear to be photos of actual boxing matches, and plaintiff acknowledges that they are of her. The picture by which plaintiff is particularly offended is at the top of the page. It shows two women, boxing or posing topless. Just to the left of this photograph, in bold print, is the name "Cat Davis", with this statement: "Her vital statistics are: 35-25-35, 16 fights and 15 k.o.'s! Pound for pound, the 132 lb beauty is one of the best female boxers in the ring today. Although her manager/husband Sal Algieri claims she's never posed nude, this photo sent in by a reader sure looks like the Top Cat to us."

Plaintiff asserts that she never granted defendants her express or implied consent to use her name, portrait or picture. She also states that she is not one of the bare-breasted boxers, and defendants "knew or should have known" this fact. She seeks compensatory and punitive damages.

After service of an answer, defendants moved to dismiss the complaint. Special Term advised the parties that it would treat the motion as one for summary judgment pursuant to CPLR 3211 (subd [c]). Thereupon both sides argued that summary judgment should be granted in their favor.

Besides offering her own affidavits, plaintiff submitted an affidavit from an attorney, Edward Grady, who knows her personally and is not involved in prosecuting this lawsuit. Mr. Grady stated categorically that plaintiff is not one of the persons in the offending photo.

Defendants presented an affidavit from Pat Reshen, editorial director of defendant High Society. Reshen asserted that prior to publication of the issue in question

plaintiff's husband/manager, Sal Algieri, approached High Society with the possibility of doing an interview with plaintiff. Before any deal was made the publication about which plaintiff complains was distributed and sold. Reshen then stated in her affidavit:

*"Source of the Photograph Of Which Complaint Is Made.* The photograph of which complaint is made was received by Defendant High Society Magazine, Inc. from a person who resides and works in Maryland who had previously furnished Defendant High Society Magazine, Inc. with photographs of public figures in unclad or semi-clad circumstances. In light of the previous publication of photographs furnished by that person, Defendant High Society Magazine, Inc. did not doubt the integrity of the source of the photograph which apparently was earlier published by another magazine. Defendant High Society Magazine, Inc., in fact, paid for the photograph as is its custom in like circumstances.

"However, since Mr. Algieri had earlier indicated to me that Plaintiff did not pose nude, in preparing the material for publication the Defendant High Society Magazine, Inc. made it absolutely clear that Mr. Algieri stated that Plaintiff did not pose nude and offered the opinion that the unclad female boxer in the photograph appeared to be the Plaintiff.

"At no time did the Defendant High Society Magazine, Inc. have any knowledge that the photograph was not in fact that of the Plaintiff, nor did I personally have knowledge that the photograph was not that of the Plaintiff. Defendant High Society Magazine, Inc. published the photograph and written material of which complaint is made in a publication entitled 'Celebrity Skin III' which contained photographs of many public figures in unclad or semi-clad circumstances, and the Defendant High Society Magazine, Inc. did so in the belief that the publication of such photographs of public figures was of substantial interest to a segment of the reading public."

Special Term granted summary judgment to plaintiff. It noted that defendants had "not adduced any material to seriously dispute [the] sworn statements" that neither of

the partially nude women in the photograph was the plaintiff. Nor was any issue raised as to consent. The court went on to hold that plaintiff had sustained her action under sections 50 and 51 of the Civil Rights Law since the association of plaintiff's name "with the objectionable picture is a commercial use for the purposes of trade * * * [H]er name was used to enhance the magazine sales rather than to inform the public of a newsworthy event". Defendants appeal. Inasmuch as Special Term based its decision on sections 50 and 51 of the Civil Rights Law, and the parties have only argued on appeal the applicability of these statutes, our concern is primarily the cause of action predicated on the alleged violation of plaintiff's right to privacy.[1]

In pertinent part, section 51 reads as follows: "Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait or picture in such manner as is forbidden or declared to be unlawful by section fifty of this article, the jury, in its discretion, may award exemplary damages." Section 50 is the penal version of section 51.

During the pendency of this appeal the Court of Appeals handed down an opinion which is of assistance in analyzing section 51 (*Arrington v New York Times Co.,* 55 NY2d 433). As the court in *Arrington* notes (p 439), the statute, which was enacted in 1903, was a direct result of its holding in *Roberson v Rochester Folding Box Co.* (171 NY 538). *Roberson* was an action brought by an infant plaintiff

---

1. Plaintiff's privacy claim based on sections 50 and 51 of the Civil Rights Law is addressed almost entirely to the publication of the picture of the topless boxers and the accompanying caption. Her alleged publicity claim is addressed to the whole page. We express no opinion on the question of whether there is a right of publicity in New York separate and distinct from section 51 of the Civil Rights Law (see *Brinkley v Casablancas,* 80 AD2d 428, 435-441).

against defendants who adorned their flour bags with the plaintiff's picture without her consent. The plaintiff grounded her claim upon a violation of her alleged right to privacy. In *Roberson,* the Court of Appeals traced the notion of a right to privacy to the famous and oft-cited article of Warren and Brandeis, "The Right of Privacy" (4 Harv L Rev 193). The court went on to deny the existence of a right of privacy within the common law, leaving it to the Legislature to fashion such a right, and a remedy, if it so chose (*supra,* p 545). The Legislature did so choose, and the very next year it enacted sections 50 and 51. However, as the court notes in *Arrington* (*supra,* p 439), "the Legislature confined its measured departure from existing case law to circumstances akin to those presented in *Roberson.*" That is, only the commercial use of a person's name or likeness without permission is prohibited. The Legislature has refrained from enacting a statute which would encompass the full scope of the right to privacy envisioned by Warren and Brandeis.[2]

The legislative history does suggest that section 51 is to be narrowly read. Likewise, the competing tensions between claims of invasion of privacy and the constitutional rights of free speech and a free press compel a careful delineation of the statute (*Arrington v New York Times Co., supra,* p 440; cf. *Cox Broadcasting Corp. v Cohn,* 420 US 469, 491; *Time, Inc. v Hill,* 385 US 374, 387-397). Nonetheless, " '[a] statute of this kind is not "to be obeyed grudgingly, by construing it narrowly and treating it as though it did not exist for any purpose other than that embraced within the strict construction of its words." It is "not an alien intruder in the house of the common law, but a guest to be welcomed * * * as a new and powerful aid in the accomplishment of its appointed task of accommodating the law to social needs" ' " (*Flores v Mosler Safe Co.,* 7

---

**2.** Authorities recognize four different kinds of invasion of a person's rights which can be termed violations of his right to privacy. They are " 'intrusion' " upon his solitude; public disclosures of " 'private facts' " about his personal life; publicity that places him in a " 'false light' "; and " 'appropriation' " of his name or likeness for commercial purposes (see *Zacchini v Scripps-Howard Broadcasting Co.,* 433 US 562, 571, n 7, quoting from Prosser, Privacy, 48 Cal L Rev 383, 389; Restatement, Torts 2d, §§ 652A-652E; Sack, Libel, Slander and Related Problems, §§ IX.2-IX.7).

NY2d 276, 281, quoting Justice SHIENTAG in *Lahiri v Daily Mirror,* 162 Misc 776, 779; see, also, *Spahn v Julian Messner, Inc.,* 18 NY2d 324, 327-328, on rearg 21 NY2d 124). Thus, while it remains true that "New York recognizes no right to judicial relief for the invasion of privacy beyond protection from the commercial misappropriation expressed in sections 50 and 51 of the Civil Rights Law" (*D'Agostino v Pan Amer. World Airways,* 79 AD2d 646, 647), it is also the case that the courts have broadly construed what constitutes commercial misappropriation of a person's name or picture under the statutes (see *Time, Inc. v Hill, supra,* pp 381-387, and cases cited therein).

Section 51 prohibits misappropriation for "advertising purposes or for the purposes of trade". Use for "advertising purposes" is defined as solicitation for patronage, intended to promote the sale of some collateral commodity or service (*Flores v Mosler Safe Co., supra,* p 284; *Lahiri v Daily Mirror, supra,* p 780; *Koussevitzky v Allen, Towne & Heath,* 188 Misc 479, affd 272 App Div 759). Use for the "purposes of trade" is a more problematic branch of sections 50 and 51, not susceptible to ready definition (see discussion in *Lahiri v Daily Mirror, supra*). That the publication or use of a name or picture is spurred by the profit motive or added to encourage sales or distribution of the publication is a necessary, but hardly a sufficient, ingredient in determining the existence of a trade purpose (*Arrington v New York Times Co., supra,* p 440). It has long been recognized that use of a name or picture by the media in connection with a newsworthy item is protected by the First Amendment and is not considered a use for purposes of trade within the ambit of the Civil Rights Law (see *Gautier v Pro-Football,* 304 NY 354, 359, and cases cited therein). This is true irrespective of the fact that such publications are carried on largely, and even primarily, to make a profit. More generally, it has been recognized that certain publications are of public interest and, therefore, protected, even if not strictly concerned with news or nonfictional material (e.g., *University of Notre Dame Du Lac v Twentieth Century-Fox Film Corp.,* 22 AD2d 452, affd 15 NY2d 940 [farce on college football]; *Lahiri v Daily Mirror, supra* [article on Hindu rope trick]). The question in such

cases is whether the public interest aspect of the publication is merely incidental to its commercial purpose (*Gautier v Pro-Football, supra;* see, e.g., *Brinkley v Casablancas,* 80 AD2d 428, 433 [where the sale of a poster, previously unpublicized, bearing the photograph of the plaintiff, a fashion model, was for trade purposes]).

Soon after the passage of sections 50 and 51, the Court of Appeals, in the case of *Binns v Vitagraph Co. of Amer.* (210 NY 51), wrestled with the problem of what is a trade purpose. *Binns* concerned the commercial fictionalization of the exploits of the plaintiff, who had been acclaimed as a hero after an accident at sea. Because of the plaintiff's refusal to appear on stage or in movies, the defendant produced a motion picture using an actor to portray the plaintiff, and a good deal of imagination. The movie contained five series of pictures (see *Molony v Boy Comics Publishers,* 277 App Div 166, 172-173, for a detailed account of the facts in *Binns*). The last series of pictures had nothing to do with the accident or rescue. It depicted the plaintiff, through the performance of the actor, "smiling, winking and contorting his face solely for the amusement of the spectators" (*Molony v Boy Comics Publishers, supra,* p 173). The Court of Appeals held that the use of the plaintiff's name and personality was solely commercial and for the purposes of trade, and therefore, contrary to section 51. The court emphasized that the last series of pictures "had no relation to the other pictures", or to the accident and the rescue (*Binns v Vitagraph Co. of Amer., supra,* p 58).

It is not clear from a reading of the *Binns* opinion whether the fact that the last series of pictures was unrelated to the news story determined the outcome of the case, or whether the fictionalization of the story of the accident and rescue was the critical element. At least one later case interprets the result in *Binns* as being predicated on the deviation of the last series from the narrative (*Molony v Boy Comics Publishers, supra,* p 173). On the other hand, the Court of Appeals has remarked that the fictionalization in *Binns* of the plaintiff's exploits was in violation of the Civil Rights Law (*Gautier v Pro-Football, supra,* p 360).

Cases subsequent to *Binns* (*supra*) show that a finding that a publication was for the purposes of trade may be predicated on either the lack of a reasonable connection between the use and a matter of public interest, or on a finding that the use contained substantial fictionalization or falsification (see *Pagan v New York Herald Tribune,* 32 AD2d 341, 343; affd 26 NY2d 941). Thus, when a plaintiff's photograph is used as an illustration in an article on illicit drug dealing, with which, in fact, the plaintiff has no connection, the use may be considered as one for trade (*Thompson v Close-up, Inc.,* 277 App Div 848; see *Arrington v New York Times Co., supra,* and *Murray v New York Mag. Co.,* 27 NY2d 406, for general discussion of the "no real relationship" principle). A biography of a well-known person may be found to be published for the purposes of trade under the Civil Rights Law, even though it is of obvious public interest, where its content is substantially fictionalized (*Spahn v Julian Messner, Inc.,* 18 NY2d 324, on rearg 21 NY2d 124, *supra;* for other "falsification" cases see *Sutton v Hearst Corp.,* 277 App Div 155; *Youssoupoff v Columbia Broadcasting System,* 19 AD2d 865; *Goldberg v Ideal Pub. Corp.,* 210 NYS2d 928).

The purpose of sections 50 and 51 is to prohibit commercial misappropriation of a person's name or picture. That uses for the "purposes of trade" include those afflicted with substantial falsification and those not really pertaining to matters of public interest is a conclusion that is reasonable from a semantical point of view and is also consonant with the "appointed task" of the Civil Rights Law.[3] This interpretation of the sections gives redress to the victims of some of the more devastating, but often subtle, techniques of commercial exploitation of a person's identity.

---

**3.** That falsification is relevant to the question of whether a use is for the purposes of trade under the Civil Rights Law has led some courts and authorities to conclude that New York recognized and accepted the tort of placing the plaintiff in a " 'false light' " (e.g., *Zacchini v Scripps-Howard Broadcasting Co.,* 433 US 562, 571-572; *Time, Inc. v Hill,* 385 US 374, 384, n 9; Sack, Libel, Slander and Related Problems, § IX.6, pp 440-441). However, as recently stated by the Court of Appeals in *Arrington v New York Times Co.* (55 NY2d 433), whether " 'false light' " is a recognized cause of action in New York has not yet been decided.

On the other hand, a too rigorous application of the legislative prohibition would impinge on our ideals of freedom of speech and the press. Publications which are patently fictional, which cannot be construed as describing real happenings, and which clearly were never intended to deceive or confuse the public may well have literary merit and serve the public interest. Caricature and satire do not violate the strictures of the Civil Rights Law (see *University of Notre Dame Du Lac v Twentieth Century-Fox Film Corp., supra*). Furthermore, "sanctions against either innocent or negligent misstatement would present a grave hazard of discouraging the press from exercising the constitutional guarantees" (*Time, Inc. v Hill,* 385 US 374, 389, *supra*). To alleviate any such problem, a public official or a public figure seeking to recover against a media defendant under the Civil Rights Law because of some falsification must prove that the defendant was aware of the falsification or recklessly disregarded the truth (*Time, Inc. v Hill, supra; Spahn v Julian Messner, Inc.,* 21 NY2d 124, *supra*).

Proof of knowledge of falsity or reckless disregard of the truth is not set forth explicitly as an element of the cause of action under the statute. In fact, where the suit is for compensatory damages or injunctive relief because of an improper use of a name or picture for advertising purposes, knowledge of any kind need not be shown (*Welch v Mr. Christmas,* 57 NY2d 143). However, where a use is associated with an item that would generally be considered newsworthy or of public interest and concerns a public official or figure, the Civil Rights Law is construed so that the use will be considered for the purposes of trade if it contains substantial falsification or is not really connected with the matter of public interest, and provided that the defendant was aware of, or recklessly disregarded, this fact (*Spahn v Julian Messner, Inc.,* 21 NY2d 124, 127, *supra*).

Applying the law to the facts of the case at bar, we are constrained to reverse. Defendants have not disputed the contention that the publication was made without written consent. Nor have they come forward with any evidence, such as an affidavit from the source of the offending photograph, that one of the women posing partially nude was the plaintiff. Special Term therefore properly con-

cluded, for the purposes of this motion for summary judgment, that there was no consent and that the offending photograph was not of the plaintiff (*Federal Deposit Ins. Corp. v A-Leet Commercial Servs.,* 70 AD2d 627).

Defendants may not properly claim that they are protected insofar as the caption purports to only express an opinion that one of the women posing nude is the plaintiff. While it is true that opinions are constitutionally protected (*Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 380), what is a factual statement will not be protected just because it appears in the form of an opinion. The test is how would the ordinary and average reader be apt to interpret the statement, in the context of the entire publication (*Rinaldi v Holt, Rinehart & Winston, supra,* p 382). In this case, the average reader would likely conclude, after reading the caption and looking at all three pictures, that plaintiff had, indeed, posed nude and was depicted in the photograph without a top.

The scope of what is "newsworthy" or of "public interest" is to be freely defined (*Arrington v New York Times Co.,* 55 NY2d 433, 440, *supra; Goelet v Confidential, Inc.,* 5 AD2d 226, 229-230). If, in fact, plaintiff, a well-known female boxer, posed nude in a boxing scene or actually posed in a semiclad fashion, we could not say that such is not a newsworthy event for a great many people (see *Ann-Margaret v High Soc. Mag.,* 498 F Supp, 401, 405, *supra*). Publication of a picture showing her thus would be absolutely protected. Such protection does not extend to the defendants in this case because the picture is not of the plaintiff. The offending picture, with its caption, is false and misleading.

Nonetheless, there is an element of plaintiff's cause of action which is in dispute and which cannot be resolved on this motion. It is incumbent upon plaintiff to prove at trial that defendants published the subject issue of *Celebrity Skin* with actual malice, i.e., with knowledge that the nude photo did not depict plaintiff or with reckless disregard of that fact.

There is a substantial question whether "actual malice" in the constitutional sense set down in *New York Times Co. v Sullivan* (376 US 254) and *Time, Inc. v Hill* (385 US 374,

*supra*), need be proven in Civil Rights Law cases where the plaintiff is neither a public official nor a public figure (cf. *Gertz v Robert Welch, Inc.,* 418 US 323; *Chapadeau v Utica Observer-Dispatch,* 38 NY2d 196). That issue need not be resolved in this case, since plaintiff is a limited-purpose public figure. She is not a public figure in the general sense (see *Gertz v Robert Welch, Inc., supra,* pp 351-352). However, within the context of female boxing, she's apparently very public and well-known. Since the photos and caption are related to female boxing and are the subjects of this lawsuit, plaintiff must be considered a limited-purpose public figure as a matter of law (see *Gertz v Robert Welch, Inc., supra; Oma v Hillman Periodicals,* 281 App Div 240, 244; cf. *Wolston v Reader's Digest Assn.,* 443 US 157, 167; *Greenberg v CBS, Inc.,* 69 AD2d 693, 703-705; *Lerman v Chuckleberry Pub.,* 521 F Supp 228).

The existence or absence of actual malice "does not readily lend itself to summary disposition", since it pertains to "a defendant's state of mind" (*Hutchinson v Proxmire,* 443 US 111, 120, n 9). It is alleged in the affidavit of the editorial director of High Society Magazine, Inc. that defendants did not know that the photograph did not depict the plaintiff. It is also alleged that the person who sold the photograph to defendants had, in the past, been proven reliable. Whether these allegations are true and whether reliance on the credibility of the sender of the photograph indicates a reckless disregard of the truth are factual questions which cannot be resolved on this record. Defendants have sufficiently put into question the issue of actual malice. Accordingly, we must reverse and summary judgment must be denied.

DAMIANI, J. P., MANGANO and BOYERS, JJ., concur.

Appeal from an order of the Supreme Court, Dutchess County, dated July 1, 1981, dismissed, without costs or disbursements. The order was superseded by an order of the same court, dated August 11, 1981, which was entered upon reargument.

Order dated August 11, 1981, reversed, insofar as appealed from, without costs or disbursements, order dated

July 1, 1981 vacated, and motion for summary judgment denied.