*857 OPINION OF THE COURT
Martin Evans, J.
These are motions under CPLR 3212 by defendants for summary judgment dismissing plaintiffs complaint. Plaintiff has cross-moved for summary judgment as to liability. The facts are largely conceded, and the court has viewed the entirety of the television show in which the segment complained of by plaintiff appears.
The action is brought under section 51 of the Civil Rights Law. Plaintiff, a television actor of some note, was hired in 1967 to appear in a television commercial which advertised certain cigarettes manufactured by Philip Morris, Inc. The commercial was made by or under the control of Wells, Rich & Greene (not a defendant here), the advertising agency for defendant Philip Morris, Inc., which owned the copyright to the program. The commercial was known as "Disadvantages”.
This advertisement apparently was run from 1967 until 1971 at which time advertisement of cigarettes on television was banned by the Public Health Cigarette Smoking Act. The commercial was a humorous one, and received wide acclaim at the time.
Defendant Clio Enterprises, Inc. is engaged in the business of preparing and managing the annual Clio awards ceremony which, in a competitive manner, selects the best television commercials in various categories. In 1986, in a category known as "classic commercials”, which included noteworthy commercial advertising which had been run prior to 1981, there were 102 entries. It was intended that the 4 domestic winners and the 4 foreign winners were to be inducted into what is called the "Clio Hall of Fame” as classic commercials. The commercial known as "Disadvantages” was submitted to the Clio competition in 1986 by Wells, Rich & Greene, apparently with the permission of Philip Morris. It was chosen as 1 of the 4 domestic winners, and the Clio award ceremony was shown on television in June 1986. One of plaintiffs claims is that this use of plaintiffs picture was a violation of plaintiffs statutory rights.
Clio is also in the business of preparing tapes of some of the commercials which have won awards each year. It licenses these tapes, for a fee, for use by both commercial and noncommercial organizations, apparently for research or teaching purposes, but not for commercial broadcasts. Although plaintiff has alleged that Clio has used his picture, as part of *858 "Disadvantages” for these trade purposes, which might have given rise to a cause of action (Arrington v New York Times Co., 55 NY2d 433, 442, 443 [1982]), it is shown by affidavit, and not denied by plaintiff, that no part of "Disadvantages” has been used for any such purpose by Clio.
Defendants Group W. Productions, Inc., and Westinghouse Broadcasting Company, Inc. (a Delaware corporation) were merged in 1982, before the incident alleged in this case, into Westinghouse Broadcasting Company, Inc. (an Illinois corporation). Westinghouse produces a television program known as PM Magazine. This is a 30-minute program which was syndicated in 1986 to defendant Fox Television Stations, Inc. The program contains informational, feature and news-related segments of general interest.
In the summer of 1986, Philip Morris authorized Westinghouse Broadcasting Company, Inc. to use the film of the 1967 commercial. PM Magazine produced a segment for inclusion in one of its programs which concerned the "Clio Awards”. In this segment, certain portions of some of the award-winning commercial were displayed and included as a part of this was "Disadvantages”, which displayed a picture of plaintiff.
Plaintiff claims that the consent by Philip Morris to the use of "Disadvantages” in the production of PM Magazine, and its use for that purpose by Westinghouse, for syndication to others, gives rise to rights against those defendants under section 51 of the Civil Rights Law, even though the ultimate broadcasting by Fox may have been protected. He relies on Arrington (supra) for that conclusion.
In Arrington (supra) the court held that certain defendants, who played a part in obtaining a photograph of the plaintiff which was ultimately used in a newspaper article, and whose acts consisted substantially in the obtaining and selling of the photograph, could be considered to have engaged in the " 'furtherance of [his] trade’ ”, citing Holmes v Underwood & Underwood (225 App Div 360, 362), and stated: "That the sale was to a publisher of news and articles on matters of public interest would not, in and by itself, have clothed these defendants with the publisher’s immunity from the reach of sections 50 and 51.” (Supra, at 443.)
However, apparently reacting to that decision, the Legislature amended section 51 by adding the following sentence: "[But] nothing contained in this article shall be so construed *859 as to prevent any person, firm or corporation from selling or otherwise transferring any material containing such name, portrait or picture in whatever medium to any user of such name, portrait or picture, or to any third party for sale or transfer directly or indirectly to such a user, for use in a manner lawful under this article”. (L 1983, ch 280, § 1.) Clearly, this was for the purpose of encouraging the transmission of newsworthy matter to the public, which the Arrington decision (supra), by imposing liability on sources of news, might have discouraged.
The court then must consider whether the use of the picture was lawful under section 51.
That there is no common-law right to privacy* sufficient to prevent the use of a person’s portrait is so well recognized in this State as to need no citation other than the seminal authority (Roberson v Rochester Folding Box Co., 171 NY 538).
In response to that case, and as a narrowly drafted, measured departure from the doctrine (Arrington v New York Times Co., supra), sections 50 and 51 of the Civil Rights Law were adopted. "The statute is in part at least penal, and should be construed accordingly.” (Binns v Vitagraph Co., 210 NY 51, 55.)
Section 50 provides, "A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without first having obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor.”
Section 51 reads, in pertinent part, as follows: "Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person’s name, portrait or picture in such manner as is *860 forbidden or declared unlawful by section 50 of this article, the jury, in its discretion, may award exemplary damages.”
The plaintiffs picture was, in the context shown, not used for the purposes of advertising or trade. There was no solicitation for patronage, nor was the use of the segment one which was intended to promote the sale of a collateral commodity or service. (See, Davis v High Socy. Mag., 90 AD2d 374, 379; Lerman v Flynt Distrib. Co., 745 F2d 123, 130.) It has been held that these terms should not be construed to include newsworthy events or matters of interest, which include not only political happenings and social events but also articles of interest to consumer groups and fashion events. Not only the existence of an article of commerce, but its availability at a particular place, and even its price, may be considered newsworthy to special groups. (Stephano v News Group Publ., 64 NY2d 174; Pagan v New York Herald Tribune, 32 AD2d 341.)
That the television segment was motivated by the desire of the defendants to increase their profits does not convert a newsworthy article or television show into a trade purpose, since it is the content of the material which determines whether it is newsworthy. (Creel v Crown Publishers, 115 AD2d 414 [a published guide to nude beaches contained plaintiff’s picture]; cf., Davis v High Socy. Mag., 90 AD2d 374, supra.)
It is clear from the television show itself that it was not advertising in disguise. Not only was there no showing that Philip Morris, Inc. paid to have its product advertised (which would have been illegal), but the verbal description by the narrator is one which, in a tutorial manner, described the earlier commercial in an educational manner.
The development of television commercials, and their past history, is a newsworthy matter to groups of people who are interested in that phase of our society. Not only persons in the advertising and television field, but general consumers, have an interest in the type of commercials which induce them to act.
The question of whether or not the use is for advertising, or for purposes of trade, or is so newsworthy that protection is granted to the user, may not always be easy to determine. (See Reilly v Rapperswill Corp., 50 AD2d 342.) Among the matters to be considered are whether the material contains falsifica *861 tions, or is not really consistent with matters of public interest. (Davis v High Socy. Mag., supra.)
In the present case, the court, having viewed the entire television show, can only conclude that the picture of the plaintiff was not used for either advertising or trade.
Plaintiff’s complaint is accordingly dismissed.

 In New York State the so-called "right of publicity” is merely an aspect of the right of privacy and is not an independent common-law right.