Porco v Lifetime Entertainment Servs., LLC (2021 NY Slip Op 04072)





Porco v Lifetime Entertainment Servs., LLC


2021 NY Slip Op 04072


Decided on June 24, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:June 24, 2021

531681
[*1]Christopher Porco et al., Respondents-Appellants,
v
Lifetime Entertainment Services, LLC, Appellant-Respondent.

Calendar Date:March 17, 2021

Before:Egan Jr., J.P., Lynch, Clark, Pritzker and Reynolds Fitzgerald, JJ.

Ballard Spahr, LLP, New York City (David A. Schulz of counsel), for appellant-respondent.
Hancock Estabrook, LLP, Syracuse (Alan J. Pierce of counsel), for respondents-appellants.
Davis Wright Tremaine, LLP, New York City (Nathan E. Siegel of counsel), for FX Networks, LLC and others, amici curiae.
Dentons US LLP, New York City (Michael A. Bamberger of counsel), for American Booksellers Association and others, amici curiae.



Reynolds Fitzgerald, J.
Cross appeals from an order of the Supreme Court (Powers, J.), entered June 4, 2020 in Clinton County, which, among other things, denied defendant's motion for summary judgment dismissing the second amended complaint.
The underlying facts are more fully set forth in our prior decisions in this matter (176 AD3d 1274 [2019]; 147 AD3d 1253 [2017]; 116 AD3d 1264 [2014]). Briefly, a highly publicized trial ended with plaintiff Christopher Porco being convicted of murdering his father and attempting to murder his mother, plaintiff Joan Porco (People v Porco, 71 AD3d 791, 792 [2010], affd 17 NY3d 877 [2011], cert denied 566 US 924 [2012]). This action arose out of defendant's efforts to broadcast a film entitled "Romeo Killer: The Chris Porco Story" that depicted the events surrounding the crime, investigation and criminal prosecution (116 AD3d at 1265). As set forth in their second amended complaint, plaintiffs allege that defendant violated the statutory right of privacy embodied in Civil Rights Law §§ 50 and 51 via the commercial, nonconsensual use of their names, likenesses and personalities in the film and related promotional material (176 AD3d at 1275).
In 2018, defendant moved for summary judgment dismissing the second amended complaint, arguing that the film did not violate plaintiffs' statutory right of privacy because it depicted newsworthy events to which the use of their names was reasonably related. After Supreme Court rejected plaintiffs' efforts to obtain discovery pursuant to CPLR 3212 (f) and directed them to respond to defendant's motion,[FN1] plaintiffs cross-moved for, among other things, partial summary judgment on the issue of liability. Supreme Court denied both motions and, in relevant part, found questions of fact as to whether the film's account of events was so materially and substantially fictitious as to give rise to liability. Defendant appeals and plaintiffs cross-appeal.
In order to ultimately prevail in their cause of action, plaintiffs must demonstrate that the film in question rises to the level of a "materially and substantially fictitious biography where a knowing fictionalization amounts to an all-pervasive use of imaginary incidents," culminating in "a biography that is nothing more than an attempt to trade on the persona of the plaintiff" (147 AD3d at 1254 [internal quotation marks, brackets and citations omitted]). To understand this standard, a discussion of the statutory right to privacy's development and interpretation over time is necessary. There is no common-law right of privacy in New York, prompting the Legislature to long ago create a limited right of privacy, set forth in Civil Rights Law §§ 50 and 51, that provides for criminal and civil liability where "a living person's 'name, portrait or picture' [is used] for advertising or trade purposes 'without having first obtained the written consent of such person, or[,] if a minor[,] of his or her parent or guardian'" (Messenger v Gruner + Jahr Print[*2]. & Publ., 94 NY2d 436, 441 [2000], quoting Civil Rights Law § 50; see Time, Inc. v Hill, 385 US 374, 380-381 [1967]; Lohan v Take-Two Interactive Software, Inc., 31 NY3d 111, 119 [2018]). The statutory language accordingly makes clear that the right is focused upon "the commercial use of an individual's name or likeness" (Arrington v New York Times Co., 55 NY2d 433, 439 [1982], cert denied 459 US 1146 [1983]; accord Lohan v Take-Two Interactive Software, Inc., 31 NY3d at 120), and courts have strictly limited its application to "the use of pictures, names or portraits for advertising purposes or for the purposes of trade only, and nothing more" (Finger v Omni Publs. Intl., 77 NY2d 138, 141 [1990] [internal quotation marks and citation omitted]; see Messenger v Gruner + Jahr Print. & Publ., 94 NY2d at 441).
As a result of both the narrow scope of the statutory provisions and the need to avoid a fatal "conflict with the free dissemination of thoughts, ideas, newsworthy events, and matters of public interest guaranteed by the First Amendment" (Lohan v Take-Two Interactive Software, Inc., 31 NY3d at 120 [internal quotation marks and citations omitted]; see Time, Inc. v Hill, 385 US at 382; Rand v Hearst Corp., 31 AD2d 406, 409 [1969], affd 26 NY2d 806 [1970]), courts have recognized that the provisions "do not apply to reports of newsworthy events or matters of public interest," even if the reports were produced with profit in mind (147 AD3d at 1254 [internal quotation marks and citation omitted]; see Finger v Omni Publs. Intl., 77 NY2d at 141-142; Freihofer v Hearst Corp., 65 NY2d 135, 140 [1985]; Stephano v News Group Publs., 64 NY2d 174, 184-185 [1984]). Newsworthiness is given a broad definition and "includes not only descriptions of actual events," but also descriptions of "political happenings, social trends or any subject of public interest" (Messenger v Gruner + Jahr Print. & Publ., 94 NY2d at 442; see Lohan v Take-Two Interactive Software, Inc., 31 NY3d at 120). It is therefore clear that "many types of artistic expressions, including literature, movies and theater" (Foster v Svenson, 128 AD3d 150, 156-157 [2015]), whether intended as entertainment or not, can be newsworthy and can further the "strong societal interest in facilitating access to information that enables people to discuss and understand contemporary issues" (id. at 156; see Lohan v Take-Two Interactive Software, Inc., 31 NY3d at 120; Altbach v Kulon, 302 AD2d 655, 658 [2003]; Costanza v Seinfeld, 279 AD2d 255, 255 [2001]; Hampton v Guare, 195 AD2d 366, 366 [1993], lv denied 82 NY2d 659 [1993]). The newsworthiness exception will not apply to the depiction of an individual in such a work, however, if the depiction's "newsworthy or public interest aspect . . . is merely incidental to its commercial purpose" (Foster v Svenson, 128 AD3d at 159). Accordingly, where there is a "lack of a reasonable connection between the use [of an individual's name or likeness] and a matter of [*3]public interest," or where the purported aim of the work is to provide biographical information "of obvious public interest, [but the] content is substantially fictionalized" and does not serve that interest, it will not be protected by the newsworthiness exception (Davis v High Socy. Mag., 90 AD2d 374, 381 [1982], appeal dismissed 58 NY2d 1115 [1983]; see Messenger v Gruner + Jahr Print. & Publ., 94 NY2d at 445-446; Foster v Svenson, 128 AD3d at 158; University of Notre Dame Du Lac v Twentieth Century-Fox Film Corp., 22 AD2d 452, 455 [1965], affd 15 NY2d 940 [1965]; Goelet v Confidential, Inc., 5 AD2d 226, 229 [1958]).
It is that last qualification that poses a problem in this case, as the film at issue is a docudrama, a genre that "deal[s] freely with historical events[,] especially of a recent and controversial nature" by crafting a dramatic presentation that could, in theory, mislead the viewer into believing that it was entirely accurate (Merriam-Webster Online Dictionary, docudrama [http://www.merriam-webster.com/dictionary/docudrama]; see Davis v Costa-Gavras, 654 F Supp 653, 658 [SD NY 1987]). As plaintiffs were at the heart of indisputably newsworthy events — namely, a sensational crime in which a couple were savagely attacked as they slept and the subsequent efforts to identify and bring the perpetrator to justice — defendant would be entitled to depict plaintiffs in a "news or informative presentation" about those matters, but would not have free rein to further engage in a "commercialization of [plaintiffs'] personalit[ies]" disconnected from them (Gautier v Pro-Football, Inc., 304 NY 354, 359 [1952]). Plaintiffs contend that the film presented itself as a completely accurate depiction of their roles in the newsworthy events while really providing "a materially and substantially fictitious biography where a knowing fictionalization amount[ed] to an all-pervasive use of imaginary incidents" (147 AD3d at 1254 [internal quotation marks and citations omitted]), which, if true, would render the depiction little more than an "attempt[] to trade on" the personae of plaintiffs by falsely promising information about their involvement in matters of public interest (Messenger v Gruner + Jahr Print. & Publ., 94 NY2d at 446; see Hicks v Casablanca Records, 464 F Supp 426, 433 [SD NY 1978]; Spahn v Julian Messner, Inc., 21 NY2d 124, 127 [1967]; Davis v High Socy. Mag., 90 AD2d at 381; Goelet v Confidential, Inc., 5 AD2d at 229; Dallesandro v Holt & Co., 4 AD2d 470, 472 [1957], appeal dismissed 7 NY2d 735 [1959]; Sutton v Hearst Corp., 277 App Div 155, 156 [1950]). The film would, in other words, be an "invented biograph[y]" of plaintiffs that would not "fulfill the purpose of the newsworthiness exception" because it would have no purpose at all beyond the actionable one of exploiting their names and likenesses for profit (Messenger v Gruner + Jahr Print. & Publ., 94 NY2d at 446; see Gautier v Pro-Football, Inc., 304 NY at 360; Sutton v Hearst Corp[*4]., 277 App Div at 156-157).
A review of the case law illuminates the situations in which a work claiming to depict an individual's connection to matters of public interest was so removed from those matters as to fall outside of the newsworthiness exception. For instance, although the unauthorized biography of a prominent baseball player would provide information of public interest about the player's life if accurate, the biography gave rise to liability because it was knowingly riddled "with material and substantial falsification," had no informational value and served no purpose beyond "commercial[ly] exploit[ing] [the player's] name and personality" (Spahn v Julian Messner, Inc., 21 NY2d at 127, 129; see Messenger v Gruner + Jahr Print. & Publ., 94 NY2d at 446). Similarly, while a daring sea rescue was newsworthy, a filmmaker was held liable for producing and promoting a fanciful dramatization that presented itself as the true story of the rescue and portrayed one of those involved in a manner that bore "no connection whatever with" the incident, did not "instruct or educate" the audience about it, and served no apparent purpose beyond amusing the public and boosting ticket sales (Binns v Vitagraph Co. of Am., 210 NY 51, 58 [1913]; see Molony v Boy Comics Publs., Inc., 277 App Div 166, 172-173 [1950]). With the standard in mind — and noting that the initial burden lies on the party seeking summary judgment to "make a prima facie showing of entitlement to judgment as a matter of law" — we turn to the parties' motion papers (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]).
As noted above, the sensational facts of the crime, the investigation and the trial of Christopher Porco are indisputably events of public interest, and the film therefore qualifies as newsworthy (see Alfano v NGHT, Inc., 623 F Supp 2d 355, 359 [ED NY 2009]; Freihofer v Hearst Corp., 65 NY2d at 140-141; Bement v N.Y.P. Holdings, 307 AD2d 86, 90 [2003], lv denied 100 NY2d 510 [2003]). The entire "content of the" film must therefore be reviewed to determine whether it dealt with those newsworthy events (Messenger v Gruner + Jahr Print. & Publ., 94 NY2d at 442; see Freihofer v Hearst Corp., 65 NY2d at 140-141). In that regard, defendant provided a copy of the film with a timed dialogue script as well as admissible proof of the underlying facts that included police and media interviews with Christopher Porco and excerpts from the transcript of his criminal trial.[FN2] A review of those materials confirms that the film is a dramatization that at times departed from actual events, including by recreating dialogue and scenes, using techniques such as flashbacks and staged interviews, giving fictional names to some individuals and replacing others altogether with composite characters. The film nevertheless presents a broadly accurate depiction of the crime, the ensuing criminal investigation and the trial that are matters of public interest. More importantly, the film makes no [*5]effort to present itself as unalloyed truth or claim that its depiction of plaintiffs was entirely accurate, instead alerting the viewer at the outset that it is only "[b]ased on a true story" and reiterating at the end that it is "a dramatization" in which "some names have been changed, some characters are composites and certain other characters and events have been fictionalized." In our view, the foregoing satisfied defendant's initial burden of showing that the film addressed matters of public interest through a blend of fact and fiction that was readily acknowledged, did not mislead viewers into believing that its related depictions of plaintiffs was true and was not, as a result, "so infected with fiction, dramatization or embellishment that it cannot be said to fulfill the purpose of the newsworthiness exception" (Messenger v Gruner + Jahr Print. & Publ., 94 NY2d at 446; see Alfano v NGHT, Inc., 623 F Supp 2d at 359; cf. Spahn v Julian Messner, Inc., 21 NY2d at 127, 129).
Plaintiffs responded, in essence, by complaining that aspects of their depictions in the film were inaccurate and offensive to them. As the film made clear to viewers that it was a dramatization of newsworthy events and "that the circumstances involved therein were fictitious," the goal of those inaccuracies was obviously not the actionable one of profiting off of plaintiffs by falsely claiming to give viewers the true story of their actions (Hicks v Casablanca Records, 464 F Supp at 432; see University of Notre Dame Du Lac v Twentieth Century-Fox Film Corp., 22 AD2d at 455). Plaintiffs' complaint therefore amounts to little more than the claim that that the film unreasonably placed them in a false light while presenting an account of newsworthy matters with healthy dollops of fiction, but neither a false light claim nor any other common-law privacy tort exists in New York (see Messenger v Gruner + Jahr Print. & Publ. 94 NY2d at 448; Howell v New York Post Co., 81 NY2d 115, 123 [1993]). Thus, as "the right to privacy is governed exclusively by sections 50 and 51 of the Civil Rights Law" in New York, and plaintiffs failed to raise a material question of fact as to whether the degree of fictionalization of the film transformed it into a material and substantially fictitious biography, the purpose of which was an effort to trade off plaintiffs' names and likenesses, defendant was entitled to summary judgment (Howell v New York Post Co., 81 NY2d at 123; see 147 AD3d at 1255).
Finally, plaintiffs' arguments regarding the use of their names and likenesses in promotional and advertising materials for the film are unavailing, as those materials "cannot reasonably be read to assert that plaintiff[s] endorsed or recommended" the film and were ancillary to the protected use in the film itself (Altbach v Kulon, 302 AD2d at 658; see Costanza v Seinfeld, 279 AD2d at 255). Plaintiffs' remaining claims, to the extent that they are not rendered academic by the foregoing, have been [*6]examined and lack merit.
Egan Jr., J.P., Lynch, Clark and Pritzker, JJ., concur.
ORDERED that the order is modified, on the law, without costs, by reversing so much thereof as denied defendant's motion for summary judgment dismissing the second amended complaint; said motion granted; and, as so modified, affirmed.



Footnotes

Footnote 1: Plaintiffs' appeals from two orders of Supreme Court relating to discovery are determined in a separate decision (Porco v Lifetime Entertainment Servs., LLC, ___ AD3d ___ [appeal No. 529946, decided herewith]).

Footnote 2: Contrary to plaintiffs' complaint, the evidence submitted by defendant in its motion papers was, by and large, admissible. Although newspaper and other published accounts of the crime, investigation and trial were hearsay insofar as defendant sought to present them as proof of the underlying facts, they also served the nonhearsay purpose of showing that the film was based upon, and reasonably connected to, events of public interest (see Rivera v Incorporated Vil. of Farmingdale, 29 F Supp 3d 121, 128-129 [ED NY 2013]; cf. Baines v Daily News, L.P., 51 Misc 3d 229, 236 [2015]).