**Angie GEARY, Plaintiff,**

v.

**Al GOLDSTEIN, Milky Way Productions, Inc., and Media Ranch, Inc., Defendants.**

**No. 91 Civ. 6222 (KMW).**

United States District Court, S.D. New York.

Aug. 30, 1993.

Thomas G. Merrill, Siff, Rosen & Parker, P.C., New York City, for plaintiff.

Peter L. Skolnik, Norwick & Schad, New York City, for defendants.

## OPINION AND ORDER

KIMBA M. WOOD, District Judge.

Defendants move to dismiss this diversity action for invasion of privacy and defamation. I grant the motion to dismiss that aspect of Ms. Geary's privacy claim that purports to state a claim for placing her in a false light, but I deny the motion to dismiss her remaining claims for violation of New York's privacy statute and for defamation.

## I. BACKGROUND

In 1988, plaintiff Angie Geary appeared in a commercial for Wasa Crispbread, a bread product from Sweden. The commercial juxtaposes two types of scenes: first, Ms. Geary in a towel, apparently emerging from a morning shower to a kitchen where she finds a male companion in a bathrobe, apparently washing his breakfast dishes, and, second, pictures of various types of bread. Ms. Geary approaches her companion and embraces him as the following voiceover plays:

> Today, 18 million eat this as bread [cutting to a picture of a bagel and then back to Ms. Geary and her companion], 55 million eat this [cutting to picture of a croissant and then back], 240 million eat this [cutting to a piece of white bread and then back], but only eight million eat this as bread [cutting to a picture of Wasa Crispbread].

> These people produce more safe cars and blond beauties. They invented the Nobel Prize and the zipper. They also play better tennis, and they watch less

television. That's the Swedish way. Wasa Crispbread. You can have it in America. As the commercial ends, the viewer sees Ms. Geary leaning back on the kitchen counter, embracing her companion as her elbow knocks a box of Wasa Crispbread off the counter.

After viewing the original Wasa Crispbread commercial, defendant Al Goldstein, the executive producer of the sexually explicit late-night cable television program "Midnight Blue," asked his staff to create a segment for Midnight Blue based on the Wasa Crispbread commercial ("the adaptation").[1] The resulting adaptation's first half maintained the voiceover's first paragraph and the portions of the commercial in which Ms. Geary appeared, but where the original commercial cut to pictures of various types of bread, the adaptation cut to videotape of scantily clad couples, apparently engaging in oral sex and vaginal and anal intercourse. Thus, instead of the "this" that millions of people "eat" referring to bread, as in the original commercial, "this" referred to sex organs or sexual acts in the adaptation. The original voiceover's second paragraph continued throughout the adaptation's second half, but the visual display consisted almost entirely of pornographic videotape with little cutting to the original commercial, except that it did broadcast the visual accompaniment to the commercial's tag line, "Wasa Crispbread. You can have it in America." Defendants broadcast the adaptation at least six times during October and November 1989. It is undisputed that they did not obtain Ms. Geary's permission to use her image in their program.

According to the amended complaint, after defendants began broadcasting the adaptation, Ms. Geary and members of her family received phone calls from various friends and business acquaintances in the advertising and entertainment industry who had either viewed or heard of her appearance on Midnight Blue. She also learned that the company that produced the original commercial pulled the original commercial from national television, ending the royalty income Ms. Geary received from its broadcast.[2]

---

1. The corporate defendants are also involved in the production of Midnight Blue.

2. The amended complaint does not explicitly allege a causal connection between the adapta-

Soon thereafter, Ms. Geary filed this suit for injunctive and monetary relief, asserting causes of action for invasion of privacy and defamation. Ms. Geary asserts:

> defendants' pornographic version of the Wasa Bread commercial was such that it falsely suggested to the viewing audience that Ms. Geary had either willingly participated in the Midnight Blue segment or consented to the program's use of her image and likeness from the original Wasa Bread commercial.

Amended Complaint ¶ 19.

Currently under consideration is defendants' motion to dismiss the complaint for failure to state a claim upon which relief can be granted. Defendants argue that New York's privacy statute does not apply to their adaptation, that New York does not recognize the tort of placing someone in a false light, and that the adaptation did not contain any defamatory statement. I will address each of these arguments in turn.

## II. DISCUSSION

### A. Standards for Deciding a Motion to Dismiss

The standards governing the determination of a motion to dismiss are well known. I must accept as true all of plaintiff's allegations and deny the motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

### B. New York Civil Rights Law

Section 51 of the New York Civil Rights Law grants a cause of action for injunctive and monetary relief to "[a]ny person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade" without that person's prior written consent. As mentioned, defendants do not dispute that they used Ms. Geary's image without her consent. Instead, they make three arguments as to why the statute does not apply to the adaptation. First, they argue that the First Amendment categorically immunizes entertainment or comedic broadcasts like the adaptation from state privacy statutes. Second, they assert that even absent categorical immunity, decisional law interpreting New York's privacy statute does not allow recovery where (assertedly, as here) a reasonable person would not infer that the claimant was associated with or derived benefit from her image's use. Third, they claim that even if both of those arguments fail, the statute still does not allow recovery because the adaptation falls within a well developed exception to the statute for publications and broadcasts concerning newsworthy events or matters of public interest.

In addressing defendants' arguments, I first give some background on the privacy statute's scope, describing the categories of non-consensual uses that the statute prohibits and those that it allows. I conclude that entertainment broadcasts such as the adaptation are not categorically immune from the statute. Next, I consider defendants' adaptation in light of decisional law interpreting the statute; there, I address defendants' argument that the adaptation is excepted from the statute, first, because no reasonable viewer could conclude that Ms. Geary was associated with the adaptation and, second, because defendants' asserted use of the adaptation as an editorial comment on sex in the "mainstream media" brings the adaptation within the public interest exception. I conclude that neither of these arguments justifies the court finding, as a matter of law, that the adaptation is excepted from the statute. I thus conclude that Ms. Geary has stated a claim under the statute. Whether she can prove that claim, or whether defendants can instead make a factual showing that their conduct is outside of the statute's scope, is for a jury to decide.

#### 1. The Statute's Scope
##### a. In general

As New York courts have often explained, their state's legislature enacted Section 51 of

---

tion's broadcast and the commercial's disappearance from the airwaves.

the Civil Rights Law as a direct response to *Roberson v. Rochester Folding Box Co.*, 171 N.Y. 538, 64 N.E. 442 (1902), in which the New York Court of Appeals found that a young woman whose picture was used, without her consent, to advertise the defendant's product had no cause of action against the defendant because New York did not recognize any action for invasion of privacy. Finding that result unacceptable, the legislature created a statutory privacy right that authorized suit for "any commercialization of the individual's personality without his consent." *Stephano v. News Group Publications, Inc.*, 64 N.Y.2d 174, 485 N.Y.S.2d 220, 224, 474 N.E.2d 580, 584 (1984).

The legislature did not, however, intend to grant New Yorkers absolute control over the use of their images. As the New York Court of Appeals has explained, the legislature crafted the privacy statutes "narrowly to encompass only the commercial use of an individual's name or likeness and no more." *Arrington v. New York Times Co.*, 55 N.Y.2d 433, 449 N.Y.S.2d 941, 943, 434 N.E.2d 1319, 1321 (1982), *cert. denied*, 459 U.S. 1146, 103 S.Ct. 787, 74 L.Ed.2d 994 (1983). The New York courts have consequently adopted two general restrictions on the remedial use of this statute. First, some New York courts have imposed a threshold test on privacy statute claimants, allowing a cause of action only when a rational viewer could reasonably believe that the plaintiff was voluntarily connected with or derived benefit from defendants' use of her name or likeness. One New York court, dealing with a claim brought by the University of Notre Dame against the publishers and producers of a satirical book and movie that used Notre Dame as its setting and contained many unflattering references to that university as an institution, explained this threshold test as follows:

> It is this: Is there any basis for any inference on the part of rational readers or viewers that the antics engaging their attention are anything more than fiction or that the real Notre Dame is in some way associated with its fabrication or presentation? In our judgment there is none whatsoever. They know they are not seeing or reading about real Notre Dame happen-

ings or actual Notre Dame characters; and there is nothing in the text or film from which they could reasonably infer "connection or benefit to the institution."

*University of Notre Dame Du Lac v. Twentieth Century–Fox Film Corp.*, 22 A.D.2d 452, 256 N.Y.S.2d 301, 304–05, *aff'd*, 15 N.Y.2d 940, 259 N.Y.S.2d 832, 207 N.E.2d 508 (1965) (citation omitted). *See also Velez v. VV Publishing Corp.*, 135 A.D.2d 47, 524 N.Y.S.2d 186, 189–90 (1988) (denying cause of action for privacy tort because a reasonable reader would recognize use of public figure in advertisement as satire and not implied endorsement).

Although these decisions do not explicitly say so, it appears that they are driven by an idea imported from defamation case law—that the law should protect individuals only when others say or do things that can reasonably be interpreted as harmful. Whereas in defamation that idea usually translates into a holding that only statements that one can reasonably interpret as factual are actionable, in the privacy realm it translates into a holding that the statute covers only reasonably inferable associations between the plaintiff and the user of her image. When the use of a person's name is connected with something absurd, the courts apparently reason, no inference of association—and consequently, no harm—can possibly follow.

The second restriction New York courts have imposed upon privacy statute claimants is a prohibition on recovery for non-commercial uses of a person's likeness. In addressing whether a specific, non-consensual use is "non-commercial," however, New York courts have not focussed their inquiry on the concepts of "commercial" and "non-commercial." That is because they have recognized that nearly every non-consensual use of an individual's image they review is commercial in the sense that the person using the individual's image seeks to profit from it or that the use is part of an article distributed in commerce. *See Arrington*, 449 N.Y.S.2d at 944, 434 N.E.2d at 1322 (pictures illustrating an article on a matter of public interest do not fall within statute's purview even "though the dissemination of news and views is car-

ried on for a profit or ... illustrations are added for the very purpose of encouraging sales of the publications") (citations omitted). Thus, concentrating only on whether the article in question is being put to a "commercial" use, as that term is commonly understood, would risk stifling the dissemination of news and the free exchange of ideas by causing those who illustrate events of public interest to risk lawsuits from displeased newsmakers.

Finding it impossible to focus on the publisher's profit motive, New York courts needed to create a proxy for "non-commercial use"—one that shifted focus away from profit motive and toward the "content of the article." *See Stephano*, 485 N.Y.S.2d at 225, 474 N.E.2d at 585. They found that proxy in what they have termed the "public interest exception." As the New York Court of Appeals has recently explained, "[a]lthough the statute itself does not define the terms 'advertising' or 'trade' purposes, courts have consistently held that the statute should not be construed to apply to publications concerning newsworthy events or matters of public interest." *Howell v. Post,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 354, 612 N.E.2d 699, 703 (1993) (citations omitted). *See also Davis v. High Society Magazine, Inc.,* 90 A.D.2d 374, 457 N.Y.S.2d 308, 314 (1982) ("the purpose of sections 50 and 51 is to prohibit commercial misappropriation of a person's name or picture. That uses for the 'purposes of trade' include ... those not really pertaining to matters of public interest is a conclusion that is reasonable from a semantical point of view and is also consonant with the 'appointed task' of the Civil Rights Law.") (footnote and citations omitted). Thus, when New York courts have confronted claims of exemption from the

statute similar to the one now before me, they have asked whether the non-consensual use relates to a matter of public interest, and, if so, whether the use has a real relationship to that matter of public interest. For example, in *Arrington v. New York Times Co., supra,* the New York Court of Appeals found that the non-consensual use of photograph of a well dressed black man crossing a street, to illustrate an article on the black middle class, did not violate the statute because the subject of that article was without question a matter of public interest, and the man's picture bore a sufficient relationship to that issue. Similarly, in *Finger v. Omni Publications, International, Ltd.,* 77 N.Y.2d 138, 564 N.Y.S.2d 1014, 1017, 566 N.E.2d 141, 144 (1990), that same court emphasized that "the [public interest] exception applies not only to reports of public happenings and social trends as in *Arrington,* but to matters of scientific and biological interest ..." (citations omitted). It thus held that the non-consensual use of a family's photograph to illustrate an article on fertility did not violate the statute.[3] It is important to note that, although most New York courts treat whether an unauthorized use of a person's image fits within the public interest exception, initially, as a question of law for the court, if the court finds that a factual issue exists as to that exception's application, it must leave the issue for resolution by the finder of fact. *See Titan Sports, Inc. v. Comics World Corp.,* 870 F.2d 85, 88–89 (2d Cir.1989).

b. *Whether Entertainment or Humorous Broadcasts are Entitled to Categorical Immunity from the Statute*

■ Before addressing whether either of the above-mentioned restrictions precludes

---

**3.** I note that defendants appear to assert that the New York courts use a different proxy to determine whether a use is commercial or not. They seem to suggest that as long as the article in question is neither for advertising purposes nor a product itself (such as a poster of the complainant), then the statute does not apply. As the above discussion should make clear, the New York courts' methods in applying that statute belie defendants' proffered interpretation; if the statute penalized only advertising and product uses, why, for example, would the *Arrington* or *Finger* courts engage in long discussions of whether the use of particular photographs to

illustrate magazine articles bore a relationship to matters of public interest, when it was clear to anyone that the illustrations under scrutiny were neither products in and of themselves nor part of any advertisement? The answer is that, to New York courts, determining whether something is "non-commercial" for the purposes of the privacy statute requires more than defendants suggest it does. It mandates, instead, an examination of "the content of the article," *Stephano,* 485 N.Y.S.2d at 225, 474 N.E.2d at 585, to determine whether the article under scrutiny truly is connected with a matter of public interest.

274

Ms. Geary's invocation of the privacy statute's remedies, I first must consider defendants' contention that the First Amendment and New York decisional law confer categorical immunity on broadcasts such as the adaptation, because the adaptation takes the form of entertainment or humor. The adaptation is entitled to no such blanket exemption; "as forms of expression, humor and comedy have never been held to be entitled to absolute or categorical First Amendment protection." *Frank v. National Broadcasting Co.*, 119 A.D.2d 252, 506 N.Y.S.2d 869, 872 (1986). The same holds for entertainment broadcasts in general, a point that receives emphasis even in the decisions that defendants cite for their assertion of absolute immunity, such as *Rogers v. Grimaldi*, 695 F.Supp. 112 (S.D.N.Y.1988), *aff'd*, 875 F.2d 994 (2d Cir. 1989) and *Hicks v. Casablanca Records*, 464 F.Supp. 426 (S.D.N.Y.1978). The courts deciding those cases, involving film references to the well-known public figures Ginger Rogers and Agatha Christie, respectively, did not declare movies and novels categorically exempt from privacy tort claimants. Instead, both courts *explicitly* relied on the plaintiffs' status as public figures when precluding plaintiffs' recovery; the courts held that the public figure status of the plaintiffs brought the defendants' actions within the public interest exception discussed above. *See Rogers*, 695 F.Supp. at 121, 123 ("courts have been consistently unwilling to recognize" a cause of action where "the plaintiff's name or picture was used in connection with a matter of public interest, be it news or entertainment.... Rogers and Astaire are ... 'part of the cultural history of an era,' their fame is an ... 'apt topic' for Fellini's fictional work."); *Hicks*, 464 F.Supp. at 433 (court finds no cause of action "where a fictionalized account of an event in the life of a public figure is depicted in a novel or a movie, and in such novel or movie it is evident to the public that the events so depicted are fictitious."). Defendants do not assert that Ms. Geary is a public figure whose actions are inherently of interest to the public,[4] nor does it seem that they could.

### 2. Whether the Adaptation's Individual Characteristics Exempt it from the Privacy Statute

As mentioned, defendants provide two reasons why, even if their adaptation is not categorically immune from suit by virtue of its being humor or entertainment, its individual characteristics require a finding that it is exempt from the statute's purview. First, they assert that the adaptation cannot pass the threshold test that allows recovery only when a rational viewer could reasonably believe that the plaintiff was voluntarily connected with or derived benefit from defendants' use of her name or likeness. Second, defendants assert that even if Ms. Geary's claim survives that threshold inquiry, the public interest exception protects defendants from suit because, they claim, the adaptation clearly was editorial comment addressing a matter of public interest. As defendants explain it, the adaptation:

> plainly intended to make an editorial point, commenting sharply—and no doubt to many offensively—on the palpably sexual and seductive nature of the original commercial and what defendants view as the extraordinary cynicism and hypocrisy of those who seek to sell on national television a bread product through implied nudity and sexual innuendo.

Defendants' Memorandum in Support of Motion to Dismiss at 36–37.

---

4. Strangely, defendants even go so far as to argue that "a plaintiff's public/private status is, under governing law, wholly irrelevant to claims under Sections 50 and 51." Reply Memorandum at 18 n. 10. It is true that, unlike a defamation action, the state of mind a defendant must have to violate the privacy statute is not usually dependent on the public/private status of the claimant. However, defendants' statement is flatly wrong as a statement of the law regarding the application of the public interest exception to the privacy statute. As discussed in the text, numerous courts have based their conclusion that a use falls within the public interest exception on a finding that the plaintiff is a public figure whose actions are of interest to the public. *See also Lerman v. Flynt Distributing Co.*, 745 F.2d 123, 131 (2d Cir.1984), *cert. denied*, 471 U.S. 1054, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985) ("[w]here plaintiff is a public personage or an actual participant in a newsworthy event, the use of his name or likeness is not for purposes of trade within the meaning of § 51"); *Davis*, 457 N.Y.S.2d at 315 ("[i]f, in fact, plaintiff, a well-known female boxer, posed nude in a boxing scene or actually posed in a semi-clad fashion, we could not say that such is not a newsworthy event for a great many people").

### a. Whether a reasonable viewer would necessarily infer that Ms. Geary had no connection with and derived no benefit from the adaptation

■ Defendants' reliance on this restriction on privacy act recovery is misplaced because I cannot find that, as a matter of law, no reasonable person could believe that Ms. Geary was associated with or derived benefit from the defendants' use of her name and likeness. Defendants assert that the satiric nature of their adaptation is so plain that no one could take it seriously: "there can be no possible confusion on the part of the viewer as to the satiric nature of the Parody." Defendants' Memorandum at 37. It is probably true that a reasonable viewer would believe that defendants meant the adaptation as a whole to be humorous. However, it is not true that a reasonable viewer would necessarily understand that defendants were satirizing a commercial of independent origin or that Ms. Geary had no association with what she was viewing. After all, there is nothing—neither verbal introduction nor visible printed disclaimer—attending the broadcast of the adaptation to indicate that it is a satire of a nationally broadcast commercial. Nor is there any basis to assume that even a substantial portion of the adaptation's viewers had seen the original commercial and so either knew that the adaptation was not an original production or understood that it was a parody of another company's production.[5] Given that Wasa Crispbread is not a well known product, even if viewers understood that the adaptation satirized a regular commercial, viewers might reasonably believe that the adaptation, like spoof "commercials" broadcast on shows such as "Saturday Night Live," was an original production by Midnight Blue, seeking humor in a "commercial" for a non-existent product.[6] Consequently, there is no reason to assume that the average, reasonable viewer had to know that the portions including Ms. Geary did not originate with Midnight Blue, and there is reason to conclude that viewers reasonably could have inferred that Ms. Geary had a connection with, or derived benefit from, the adaptation.

Moreover, in contrast to the situation involved in *Notre Dame, supra,* the commercial is not so disdainful of Ms. Geary to require an inference that she had no involvement with it. The adaptation does not in any way make fun of Ms. Geary herself, nor does it give any reason for a viewer to distinguish her from the many actresses who agreed to appear in the adaptation's pornographic portions. Unlike courts and litigators, television viewers see such segments but once and in real time, a fact that anyone propounding a reasonable interpretation must take into account.

In short, Ms. Geary's claim does pass the threshold test, because the average, reasonable viewer would not, as a matter of law, necessarily realize that Ms. Geary neither was associated with, nor derived benefit from, the adaptation.

### b. Whether the adaptation falls within the public interest exception as a matter of law

■ Defendants next argue that as alleged editorial expression, the adaptation necessar-

---

**5.** It is true that regular viewers of Midnight Blue may have known (although I do not find that they would necessarily have known) that the adaptation incorporated portions of a regularly broadcast commercial, because Midnight Blue apparently often includes such adaptations in its program. However, nothing in the decisional law or in the parties' presentations to date indicates that I am to substitute "regular viewer" for "reasonable viewer" when making the threshold determination. Nor does common sense dictate that I do so. In contrast to readers of novels or newspapers, who one can assume are usually aware of the nature of the publication they are reading, cable television viewers often are unaware of the nature of the material they view, given the frequency with which many viewers flip from channel to channel, settling on a program for only a short period of time and then moving on to a new one. Because an average viewer of the adaptation may have seen only the adaptation itself or a small part of the program surrounding it, I can look only to the adaptation itself when determining whether, as a matter of law, an average viewer would assume that Ms. Geary had no association with it.

**6.** The adaptation's near seamless flow would support such a conclusion. For example, at one point a man in a pornographic part of the adaptation ejaculates into the mouth of a woman whose face is obscured. The adaptation immediately cuts to Ms. Geary wiping her mouth, in a portion from the original commercial.

ily falls within the public interest exception to the statute. Moreover, they assert, their mere claim that the adaptation was editorial comment requires this court to apply the public interest exception.

Defendants are correct in asserting that it is not the business of this court to pass on the merit of defendants' views or to "determin[e] what editorial content is of legitimate public interest;" that is a job for editors and publishers, not for courts. *Gaeta v. New York News, Inc.*, 62 N.Y.2d 340, 477 N.Y.S.2d 82, 85, 465 N.E.2d 802, 805 (1984). However, in cases like this one, courts are required to decide whether a factual issue exists as to whether or not a person's image was used in connection with editorial expression. As discussed at length above, when a defendant relies on the public interest exception, courts must evaluate the article under scrutiny to determine whether it deals with a matter of public interest. *See, e.g., Titan Sports, Inc. v. Comics World Corp.*, 870 F.2d 85, 88–89 (2d Cir.1989) (in determining whether posters included in magazine fall within statute's purview, "trial court must consider whether these photos are included primarily for their 'public interest aspect' or whether whatever public interest aspect might be involved 'is merely incidental to [the distributors'] commercial purpose.'") (citations omitted). Such a practice makes perfect sense. If courts allow broadcasters to remove themselves from the statute's reach simply by saying that they (the broadcasters) view their broadcast as an editorial, without requiring them to point to objective indicia that that is the case, then any defendant could escape the statute's limitations merely by claiming that his unauthorized use expressed editorial views. Instead, where a court finds that a factual issue exists regarding whether an image was used in connection with editorial expression, the broadcaster must establish that defense at trial.

Here, there is no objective indication that would require a fact finder to conclude that the adaptation's makers intended it to have editorial content. As mentioned above, no editorial comment surrounds the adaptation's presentation, and a reasonable viewer might not even necessarily understand that a nationally broadcast commercial—the alleged target of the editorial content—was part of the adaptation. Even if the viewer did know that portions of the adaptation originated with a nationally broadcast commercial, a reasonable viewer could conclude that Midnight Blue was merely attempting a humorous word play—showing people about to eat breakfast, but cutting to sexual organs when talking about the "this" that people eat. This interpretation would find support in two other adaptations broadcast in one episode of Midnight Blue in which the Wasa Crispbread adaptation appeared. Although sexual motifs were notably absent from the original commercials on which those other adaptations were based (one for General Motors and one for Roy Rogers), both of the commercials did use the words "big," referring respectively to GM's "Big Easy Summer Sale" and Roy Rogers' "New Big Chicken Sandwich." Defendants adapted these commercials so that "big" referred instead to superimposed pictures of male genitalia. The use of nationally broadcast commercials lacking the alleged (sexual) basis for editorializing about the Wasa Crispbread commercial suggests that Midnight Blue may be using the nationally broadcast commercials simply to amuse its viewers or to reduce its costs of producing original programming, rather than to editorialize. In light of these other adaptations, the absence of any objective indicia that the adaptation is an editorial comment, and the fact that "an insignificant public interest aspect of a 'publication' cannot exempt it from the reach of [the privacy statute] where the primary aspect of the product is commercial," *Titan Sports*, 870 F.2d at 87, I find that there is a factual dispute over whether the adaptation falls within the public interest exception.[7] I

7. I recognize that viewers who stayed tuned to Midnight Blue to see the Roy Rogers and GM adaptations, which were broadcast approximately five to ten minutes after the Wasa Crispbread adaptation in the episode submitted to the court, might realize in retrospect that the adaptation at issue here was not entirely original to Midnight Blue. However, I find no reason to conclude that an average, reasonable viewer would have to reach such a conclusion. Moreover, as discussed in footnote 5, given the prevalence of "channel surfing," I have no basis upon which to

therefore must deny defendants' motion to dismiss this aspect of Ms. Geary's privacy claim.[8]

## C. False Light

■ In addition to their assertion of immunity from the privacy statute, defendants provide an additional ground for dismissing that part of Ms. Geary's privacy claim that asserts a cause of action for placing her in a false light. Defendants are correct that New York does not recognize an independent cause of action for the common law "false light" tort. *See Howell v. New York Post,* 596 N.Y.S.2d at 354, 612 N.E.2d at 703. I thus must dismiss the portion of Ms. Geary's privacy claim that purports to state such a claim.

## D. The Defamation Claim

■ Defendants also argue that Ms. Geary fails to state a claim for defamation. They make two arguments in support of this part of their motion. First, they argue that Ms. Geary has no defamation claim because defendants made no statement about her. In essence, they assert that because they uttered no words about her that could constitute a defamatory *statement,* Ms. Geary cannot possibly state a claim for defamation. Second, in an argument that parallels their privacy statute argument, they assert that even if the juxtaposition of two pieces of videotape could theoretically be held to be a

statement under defamation law, Ms. Geary still has no claim; they argue that no reasonable person would infer from the adaptation that Ms. Geary willingly either participated in, or consented to her appearance in, a pornographic program. I have already addressed at length why I cannot find as a matter of law that no reasonable person could so interpret the adaptation, and for these same reasons, I reject the latter argument in this context.

Regarding defendants' first assertion, that the juxtaposition of two pieces of videotape is not a "statement," numerous decisions have held that the implication derived from photographs can be actionable. *See, e.g., Regan v. Sullivan,* 557 F.2d 300, 308–09 (2d Cir.1977); *Burton v. Crowell Pub. Co.,* 82 F.2d 154, 155 (2d Cir.1936). I see no basis upon which to distinguish the implication made by the juxtaposition of two images in a videotape from that made by one standing image in a photograph, as long as the implication is itself one that a reasonable person would draw and the implication is actionable.[9] Because I find that the adaptation is subject to a defamatory interpretation—that Ms. Geary willingly participated in a pornographic video segment—and that such an interpretation could be one that "brings [her] into hatred, contempt or ridicule by asserting some moral discredit upon [her] part," *Schermerhorn v. Rosenberg,* 73 A.D.2d 276, 426 N.Y.S.2d 274, 281 (1980) (citation omitted),[10] I conclude that

---

conclude as a matter of law that an average, reasonable viewer would necessarily have stayed tuned to Midnight Blue through the six commercials for telephone sex lines that separated the adaptations. Finally, viewers would not necessarily have concluded, based on the latter two adaptations of commercials for very well known products, that the commercial for Wasa Crispbread—whose name recognition is not so pervasive—did not originate entirely with Midnight Blue.

8. I note that defendants predict that such a conclusion will wreak untold damage upon the media. Defendants argue that allowing Ms. Geary any recourse for their non-consensual use of her image amounts to censorship and impinges on their free speech rights. They are wrong. Nothing in this decision prevents defendants from continuing to broadcast sexually explicit material in their show or from expressing any views they choose to express. It merely prevents them from exploiting, without payment, for the purposes of

their trade (their television show), the image of a non-public figure without that person's consent if the use is not connected with a matter of public interest.

9. For that matter, I see no basis on which to distinguish between implications made by juxtaposed images and those made by juxtaposed statements. Defendants do not dispute that statements that are not in and of themselves actionable, may become actionable if, when juxtaposed, they then carry a defamatory implication. *See Herbert v. Lando,* 781 F.2d 298, 307 n. 4 (2d Cir.1986).

10. I recognize that at least one federal court has indicated that implying that someone appeared in pornography could not be defamatory "in today's moral climate." *Douglass v. Hustler Magazine, Inc.,* 769 F.2d 1128, 1135 (7th Cir.1985). I disagree that such a conclusion is so clear that it can be reached as a matter of law. One need

Ms. Geary has stated a cause of action for defamation.[11] Whether she will be able to prove that claim is a matter for the jury.

## III. CONCLUSION

For the reasons discussed above, defendants' motion to dismiss is granted in part and denied in part. The parties shall complete discovery by October 29, 1993 and shall file any dispositive motions by November 19, 1993. If no such motion is filed, they shall submit their joint pre-trial order, memoranda of law, proposed *voir dire*, and requests to charge no later than December 6, 1993, and be ready for trial on December 7, 1993.

SO ORDERED.

only consider that a mere nine years ago, a woman was prevented from serving as Miss America because she had posed for nude photos several years before. *See* "Miss America Asked to Quit Over Photos Showing Her Nude," New York Times, July 21, 1984, Al Col. 6 (quoting executive director of Miss America Pageant as saying that for Vanessa Williams to "remain as Miss America would seriously jeopardize and irrevocably damage the entire Miss America Pageant program"). I cannot conclude, as a matter of law, that an actress trying to succeed in main-stream productions would not face serious obstacles to her career and a damaged reputation in her community, if people believed that she had appeared in pornography.

11. I note that the parties have neither briefed Ms. Geary's ability to prove that defendants acted with the requisite intent nor suggested whether the requisite level of intent is negligence or malice. Consequently, my decision that Ms. Geary has stated a defamation claim is based only on my conclusion that I cannot decide as a matter of law that a reasonable person could *not* draw a defamatory conclusion from the adaptation. It should not be taken as addressing whether Ms. Geary must show that defendants knew or should have known of that possible implication, or that they acted with negligence or actual malice, before she can recover for defamation.