Bellacosa, J.
(dissenting). I respectfully disagree and would answer the first question in the affirmative. Under the analysis of the Per Curiam opinion, no matter what the published photographs of plaintiff depict or connote, if the words of the column project an abstractly newsworthy subject matter, then the judicially created newsworthiness exemption forecloses the remedy of Civil Rights Law §§50 and 51. This latest extension marginalizes the statutory authorization that was enacted expressly to supply potential redress for aggrandizing uses of a person’s “portrait or picture.”
We all agree that the courts have properly created a newsworthiness exception to liability pursuant to the Civil Rights statute. The courts have, however, also harnessed a runaway newsworthiness exemption with exceptions. Part of the puzzle here is whether there are two exceptions — advertisement in disguise and no “real relationship” — or three — also a distinctive “material and substantial falsification” prong.
A recent decision of this Court fosters the vexing implication that only two exceptions to the newsworthiness exemption exist because the case happens to mention only two (Finger v Omni Publs. Intl., 77 NY2d 138). That, in part, may explain the Second Circuit Court’s quandary as to whether the *449 “substantial falsification” facet is still viable to mitigate a functionally sweeping newsworthiness immunization against the invocation of the statute.
If the “fictionalization exception” remains part of New York law, as I contend, then despite the newsworthiness of part of the published column — which might otherwise operate to block this plaintiffs invocation of the remedial statute against defendants — Messenger’s victory before a Federal jury could be sustainable. If, on the other hand, the “fictionalization exception” is rendered a “dead letter” — and newsworthiness reigns — then Messenger’s Federal lawsuit is equally comatose.
L
Civil Rights Law § 50 provides that anyone using a picture of a living person for the purposes of trade, without having first obtained the written consent of such person, or a parent or guardian, commits a misdemeanor. Civil Rights Law § 51 adds the civil damages teeth. These complementary provisions were enacted in response to early judicial reluctance against recognizing a common-law right of privacy, coupled with a judicially expressed encouragement for a legislative solution (see, Roberson v Rochester Folding Box Co., 171 NY 538 [1902]).
The Legislature acted in 1903. It also left the courts with a hefty burden of substantive interpretation that continued through the whole 20th Century, and now into Year 2000.[1] Shortly after the statutory framework came into being, this Court examined the fictionalization of a plaintiff’s exploits and found defendants liable under the statute (Binns v Vitagraph Co., 210 NY 51 [1913]). The Court also warned of the difficulties of “the practical enforcement of any rule which may be adopted in construing and enforcing the statute so far as it relates to purposes of trade;” it encouraged further legislative ac *450 tion to clarify the key phrase (Binns v Vitagraph Co., supra, at 58-59). No new enactment ensued, and the courts have continued the struggle to apply the definition of “purposes of trade.”
A comprehensive exegesis emerged in 1937 in Lahiri v Daily Mirror (162 Misc 776 [Sup Ct, NY County, Sheintag, J.]). An important feature of the opinion includes an observation that “the emphasis [in cases where liability pursuant to the statute was found] was placed on dramatization rather than information” (Lahiri v Daily Mirror, supra, at 781 [emphasis added]).
Courts continued to use the “dramatization” feature to distinguish between the statute’s availability or inertness. When “the total dominant impression conveyed is basically not a true picture or representation of the actual salient facts,” and when the “article read as a whole, together with the headings and the pictorial representations that accompany it, constitute a sensationalized version of facts embellished with matters drawn from the author’s imagination,” the material may go “far beyond the scope of proper immunity pertaining to the publication of current or past news;” there, the complaint should not be stricken (Sutton v Hearst Corp., 277 App Div 155, 156-157 [1st Dept 1950], Iv denied 277 App Div 873, citing Binns v Vitagraph Co., supra [emphasis added]). Also, when the photograph of a plaintiff was juxtaposed next to an article about a subject (e.g., dope peddling) with which the plaintiff had no connection, the use has been deemed for purposes of trade (Thompson v Close-Up, Inc., 277 App Div 848 [1st Dept 1950]).
Shortly after these Appellate Division decisions, this Court ruled on a statutory privacy claim stemming from the televised projection of a plaintiff who had performed during the halftime show of a professional football game. After the Court found that the telecast of the plaintiff’s act had not been used for advertising purposes, this Court plumbed the definition of “use for purposes of trade” with respect to television, which, “[l]ike other media * * * may have either a trade aspect or an informative or news aspect” (Gautier v Pro-Football, Inc., 304 NY 354, 359 [1952]). The Court noted that use of a name or picture “in connection with an item of news or one that is newsworthy, is not a use for purposes of trade within the meaning of [the statute]” (Gautier v Pro-Football, Inc., supra, at 359). It cautioned, however, that there must be a “legitimate” connection between the item of news and the use of a name or *451 picture in order to remove the use from the realm of “trade” (Gautier v Pro-Football, Inc., supra, at 359, citing, inter alia, Lahiri v Daily Mirror, supra).
The Court also discretely emphasized that simply because a public figure or a presently newsworthy person is the proper' subject of news or informative presentation, the newsworthy “privilege does not extend to commercialization of his personality through a form of treatment distinct from the dissemination of news or information” (id,., at 359, citing, inter alia, Binns v Vitagraph Co., supra; Sutton v Hearst Corp., supra). Alluding particularly to Sutton, the Court underscored the fact that the question was whether the story “as presented to the reader” was “so embellished in the telling that it was no longer a factual report” (Gautier v Pro-Football, Inc., supra, at 360). If the story was so dramatized, its newsworthiness immunity from the operation of the statute is forfeited and lost (see, id.).
The precedential value of Gautier, amidst the nuanced history of this statute in relation to the interpretive precedents, is — or should still be — a matter of greater qualitative, yet not controlling, value than the majority allows.
IL
This Court enunciated a fictionalization exception to newsworthiness immunity, consistent with the seminal Gautier analysis, when it found that a substantially fictionalized biography constituted an unauthorized exploitation of the plaintiffs personality “for purposes of trade” (see, Spahn v Julian Messner, Inc., 18 NY2d 324 [1966], adhered to on rearg 21 NY2d 124). The Court recognized that even a public figure’s “personality” may be “fictionalized,” and as such, the baseball star’s story was found to have exploited his persona for commercial value (see, id., at 328).
On reargument of Spahn in light of the United States Supreme Court’s Time, Inc. v Hill (385 US 374) decision, this Court stood by its initial decision with respect to the fictionalized account of the professional athlete’s life. The Court, of course, also necessarily imbued the authoritative interpretation of New York substantive law with the requisite constitutional speech protections:
“[B]efore recovery by a public figure may be had for an unauthorized presentation of his life, it must be shown, in addition to the other requirements of the statute, that the presentation is infected with mate *452 rial and substantial falsification and that the work was published with knowledge of such falsification or with a reckless disregard for the truth” (Spahn v Julian Messner, Inc., 21 NY2d 124, 127 [1967] [emphasis added]).
The Court found that the use of “invented dialogue” to supply “a dramatic portrayal attractive to the juvenile reader” in a manner “customary” for the type of book involved did not entitle the defendants to publish such “knowing fictionalization,” which was “destructive of an individual’s right * * * to be free of the commercial exploitation of his name and personality” (Spahn v Julian Messner, Inc., 21 NY2d, supra, at 127-129). Thus, if there was any doubt after Gautier that the courts should make a fictionalization/falsification examination in a “purposes of trade” inquiry, Spahn II provided enduring insights. The quoted language offers significant relevance, not the ephemeral distinguishments proffered by the majority.
The protection for exploited persons against falsification or fictionalization for public figures was also extended to private individuals in Pagan v New York Herald Tribune (32 AD2d 341 [1st Dept 1969], affd without opn 26 NY2d 941 [1970]). The Appellate Division opinion summarized pertinent law regarding when the use of a name or picture falls outside the statute’s meaning of “purposes of trade”:
“Where a picture of an individual is published in a newspaper or magazine in connection with the presentation, without false or misleading material, of a matter of legitimate public interest to readers, and the picture bears a reasonable relationship to the presentation, the use of the picture in the publication is not actionable as a use for the purpose of advertising or trade within the prohibition of the statute unless the presentation is in effect an advertisement in disguise” (Pagan v New York Herald Tribune, supra, at 343 [emphasis added]).
If a Shirley Temple-like set of photos were used with this identical column, that would more than likely be actionable, as trading on the persona of a famous individual. The 14-year-old plaintiff adolescent, a private person who cannot even legally give consent to the use of her photos, should have no less a remedy for someone trading on her persona and aspirations, the particular protection tendered by the statute. This contrast dramatizes the irony of a real tension, as I see it, between the *453 extant precedential lines and a growing atrophy of the Civil Rights statute.
IIL
This Court more recently has had an opportunity to examine the Civil Rights Law in the context of a series of cases that analyzed essentially only the “no real relationship” exception. A magazine cover depicted a plaintiff, not of Irish extraction, in a St. Patrick’s Day Parade, with the title of the feature article, “The Last of the Irish Immigrants” (Murray v New York Mag. Co., 27 NY2d 406 [1971]). The opinion addressed only the question “ ‘whether the plaintiffs photograph has some relevance to the article’” (id., at 408), but part of Murray has become the resounding sound bite for Civil Rights Law §§ 50 and 51 jurisprudence as follows:
“ ‘A picture illustrating an article on a matter of public interest is not considered used for the purpose of trade or advertising within the prohibition of the statute * * * unless it has no real relationship to the article * * * or unless the article is an advertisement in disguise’. (Dallesandro v. Holt & Co., 4 AD 2d 470, 471, app. dsmd. 7 N Y2d 735; see, also, Pagan v. New York Herald Tribune, 32 A D 2d 341, affd. 26 N Y 2d 941 * * *)” (Murray v New York Mag. Co., supra, at 409).
However, as sound bites are often misleading due to their lack of context, so too is Murray’s extrapolation from Dallesandro. A careful tracing of the Dallesandro material that has popped out as “the quotable quote” from Murray reveals that Dallesandro faithfully cited to and relied on the seminal whole-cloth of Gautier:
“A picture illustrating an article on a matter of public interest is not considered used for the purpose of trade or advertising within the prohibition of the statute (Gautier v. Pro-Football, 304 N. Y. 354, 359) unless it has no real relationship to the article (Thompson v. Close-Up, 277 App. Div. 848), or unless the article is an advertisement in disguise (Griffin v. Medical Soc. of State of N. Y., 7 Misc 2d 549)” (Dallesandro v Holt & Co., 4 AD2d 470, 471).
All the pieces are pivotal, in my view, for a plenary appreciation of the jurisprudence affecting the instant controversy — not *454 just the latest cases, as the majority posits. As I have pointed out, Gautier emphasized separately the importance of dramatization or fictionalization when analyzing whether a use was “for purposes of trade,” an inquiry distinct from, yet not divorced from, the real relationship issue. This citation to Gautier was not crucial in Murray, where the only question was whether the photograph was reasonably connected to the article (see, Murray v New York Mag. Co., 27 NY2d 406, revg 35 AD2d 557). But the faithful link to Gautier in Dallesandro has simply gotten lost along the way.
Additionally, Murray also extracts from Pagan a quotation pertinent to the Murray issue, to wit, “that picture was published * * * ‘in connection with the presentation * * * of a matter of legitimate public interest to readers’ ” (27 NY2d, at 409). Again, this excerpt summarized the state of New York law as far as was concerned in Murray, replacing with ellipses the material that, because of the limited nature of the inquiry in Murray, was not necessarily apt — unlike in the instant case. Indeed, the omitted language is key here — the presentation must be made “without false or misleading material” (Pagan v New York Herald Tribune, 32 AD2d 341, 343, affd without opn 26 NY2d 941, supra).
The abbreviated use of excerpts from the line of precedents is understandable in Murray and more recent cases involving “real relationship” core problems (see, Arrington v New York Times Co., 55 NY2d 433 [1982]; see also, Stephano v News Group Publs., 64 NY2d 174, 184-185 [1984]). The truncated use, however, must be recognized and reconciled to provide a thorough understanding of the applicable principles.
The most recent and next significant Court of Appeals development analyzing the “no real relationship” issue is the case that seems to have sealed the Second Circuit Court of Appeals’ need to certify to this Court its uncertainties about the state of New York law (Finger v Omni Publs. Intl., 77 NY2d 138 [1990]). In the briefs to this Court, the Finger plaintiffs urged one question only — “whether a real relationship existed between the photograph * * * and an article dealing specifically with caffeine enhanced in vitro fertilization.” The plaintiffs only tangentially touched on the falsification question, while they relied primarily on Arrington and Murray. They urged that the story “is of such a tenuous nature that it creates the false and misleading perception that [the] family was conceived using in vitro fertilization or‘caffeine enhancement techniques.”
*455 Indeed, this Court considered the plaintiffs’ argument as one of purely “ ‘no real relationship’” (Finger v Omni Publs. Intl., supra, at 142; compare, Davis v High Socy. Mag., 90 AD2d 374; Lerman v Flynt Distrib. Co., 14:5 F2d 123 [examining precedent of this Court that supports the substantial fictionalization premise and exception]). Since the Finger plaintiffs hinged the false perception argument on the premise that there was no real relationship, once the Court determined that a real relationship existed, the Court ended the analysis. It did not have to take the further step implicated point-blank in this case — to address the falsification issue. Because the majority essentially subsumes this step, I disagree with its analysis leading to the negative answer to the first certified question.
The fact that Finger did not purport to address the falsification issue could support the argument that this third exception did not survive Finger. The answer, however, to the Second Circuit’s question of whether Finger mutes the Spahn falsification exception may more reliably be found, I respectfully submit, by nimble, precise tracings to the authority sources found within Finger itself. Finger continues the scrunched Murray-Dallesandro snippet that replaced with ellipses Dallesandro’s reference to Gautier (Finger v Omni Publs. Intl., supra, at 142). Intriguingly, however, Finger also cites to page 185 of the Stephana opinion. This important reference contains (1) the citation to the page in Gautier, which, citing to Sutton, issued the admonition against dramatization or fictionalization, and (2) the citation to Pagan, which extended the fictionalization concern to private persons. The failure to discuss Spahn, the most obvious fictionalization precedent, in Finger is thus explained away for me, though my over-all view is summed up by the majority as a misinterpretation. Spahn, unlike Finger, involved a public figure. The reference, instead, to a case that relied on Pagan is far more revealing. Pagan essentially tells us that if a purveyor is going to present the photograph of an individual, even in conjunction with a newsworthy item, the presentation must be legitimately made “without false or misleading material” (Pagan v New York Herald Tribune, supra, at 343). That is still good law and supports the affirmative answer I would give to the question posed in relation to this controversy.
In any event, the substantive law question of this case was simply not the dispositive or necessarily implicated thrust in Finger. Thus, the instant case is also demonstrably distinguishable from Finger on its facts and import. In Finger, “[n]ei *456 ther the article nor the caption mentioned plaintiffs’ names or indicated in any fashion that the adult plaintiffs used caffeine or that the children were produced through in vitro fertilization” (Finger v Omni Publs. Intl., supra, at 140 [emphasis added]).
Here, the caption juxtaposed next to and across a large picture of Jamie Messenger, looking “hung over,” states, “7 got trashed and had sex with three guys * * * Even worse, 7 heard them laughing about it the next day” (emphasis added). The smaller caption within the photograph with Messenger reads, “You made a pretty big mistake” (emphasis added). Another caption within another picture of Messenger looking distraught reads, “Afraid you're pregnant?” (emphasis added). These captions, “pull quotes” and photographs leap off the page with the real relationship to the published material — which is not contested — but also with the substantial falsification of the photographs in the kind, manner and degree to which they were exploited. In Finger, there was no indication in any fashion that the plaintiffs in the associated picture had experienced what was described in the content of the article. In this case, that very linkage is soldered together and dramatized. In my opinion, that is what takes this case over tolerable lines and limits.
Here, a Federal court jury found that reasonable readers would think Messenger was unquestionably the subject and signatory of an ersatz letter. Despite the abstracted public-interest newsworthy quality of the editor’s answer to the letter, the falsified connection — “7 got trashed” — personalizes the matter in a devastating fashion. Even though the column enjoys the academic quality of a newsworthy subject matter, its presentation publicly paraded plaintiff as the epitomized subject for sensationalized impact.[2] That should not be immune from the statute’s reach.
I am unable to discern support in this Court’s developed line of analysis — until today — for the conclusion that this substantially fictionalized portrayal of Messenger’s likeness is beyond the statute’s ken just because something about it is newsworthy in a general way. That, as I understand it — or misinterpret it, as the majority characterizes my view — is the bottom line of *457 the majority’s negative answer transmitted to the Second Circuit. For me, New York law supports a more nuanced and generous approach to the applicability of this now largely immobilized statute that is functionally and realistically foreclosed by today’s ruling (see, Binns v Vitagraph Co., supra; Gautier v Pro-Football, Inc., supra, citing Sutton v Hearst Corp., supra; Spahn I, supra, and Spahn II, supra; Pagan v New York Herald Tribune, supra; Stephano v News Group Publs., supra; see also, Lerman v Flynt Distrib. Co., supra; Davis v High Socy. Mag., supra).
In sum, the practical and theoretical consequence of the negative answer justifies a too-facile escape valve from the operation of the statute, one that is also unilaterally within the control of the alleged wrongdoer. The paradigm for editors is a “newsworthy” homily to lovesick adolescents or any other audience; they then just have to use a journalistic conceit of tieing the advice to a purported letter to the editor, with an inescapable first person identification of the letter as originating with any adolescent in the photo array. When an aggrieved person like Messenger reaches for the statutory lifeline, the newsworthiness notion dissipates it into a dry mirage. That is not fair or right.
Strong New York jurisprudence and protection of constitutional speech guarantees — that I too support — are urged as overarching policy reasons for courts to be very circumspect with respect to claims under the Civil Rights statutes. That should not be a preemptive justification for courts to neutralize, in functional applications, a remedial statute that this Court nudged into existence. In the endeavor to live up to this Court’s and New York’s robust tradition of free speech and free press protections, statutory rights and reputations of individuals can also be proportionately safeguarded and legitimately redressed.
Chief Judge Kaye and Judges Smith, Levine, Ciparick, Wesley and Rosenblatt concur in Per Curiam opinion; Judge Bellacosa dissents and votes to answer certified question No. 1 in the affirmative in a separate opinion.
Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.17 of the Rules of the Court of Appeals (22 NYCRR 500.17), and after hearing argument by counsel for the parties and consideration of the *458 briefs and the record submitted, certified question No. 1 answered in the negative and certified question No. 2 not answered.

. A prescient Law Review note in 1990 suggested “that New York’s continued refusal to recognize a common-law right to privacy is becoming increasingly troublesome as the twenty-first century draws near and the threat to individual privacy mounts with the emergence of new technologies capable of ever more intrusive applications. In addition, this Note will assert that this refusal to recognize a right to privacy is rendered all the more distressing by the fact that, despite the extraordinary number of privacy-related cases that have filtered through the New York courts, there is an undeniable paucity of decisions in which the courts have satisfactorily explained the reasoning behind this continued refusal to embrace a right so fundamental to American society” (Note, The Right to Privacy One Hundred Years Later: New York Stands Firm as the World and Law Around it Change, 64 St John’s L Rev 315, 323).

. The resolution of the Federal appeal and the answer to the certified questions are complicated further by the District Court ruling which precluded the plaintiffs proof and evidence with respect to a bifurcated fictionalization in relation to the published verbiage, as distinguished from the photographs themselves in their juxtaposition to the texts.