OPINION OF THE COURT
Renwick, J.
This appeal stems from an action alleging fraud with respect to an investment bank’s sale of collateralized debt obligations (CDOs) which depended upon the positive performance of residential mortgage-backed securities (RMBS). The main issue here is whether the seller’s disclaimers and disclosures in the offering documents preclude the purchasers from establishing the reasonable reliance element of the fraud claim. Usually, comprehensive disclaimers contained in carefully drafted documents executed by sophisticated commercial parties are sufficient to insulate sellers from tort liability (see e.g. HSH Nordbank AG v UBS AG, 95 AD3d 185 [1st Dept 2012]). But there is a limit to the efficacy of those disclaimers, as this case aptly demonstrates.
Plaintiffs Loreley Financing Ltd.(s) (Jersey No. 3 Ltd., No. 5 Ltd., No. 6 Ltd., No. 7 Ltd., No. 25 Ltd., No. 27 Ltd., No. 29 Ltd., No. 31 Ltd., and No. 32 Ltd.) are companies organized under the laws of Jersey, Channel Islands. Between September 2006 and June 2007, through their investment advisors, non-parties IKB Deutsche Industries Bank AG and IKB Credit Assets Management GmbH, plaintiffs invested in nearly $1 billion of CDOs backed by RMBS: Lacerta, Jackson, Cookson, Pinnacle Peak, ABSynth and Plettenberg Bay. At the time of these transactions, Citigroup and its affiliates were reportedly major players at multiple levels of the subprime capital market; Citigroup acted as a mortgage originator, an underwriter of subprime RMBS, and an arranger of structured finance products, like CDOs, that invested in RMBS. In this case, Citigroup’s affiliates, Citigroup Global Markets Inc. (CGMI) and Citigroup Global Markets Limited (CGML), were the underwriters and direct sellers of the Lacerta, Jackson, Cookson, Pinnacle Peak, ABSynth and Plettenberg Bay CDOs purchased by plaintiffs in 2006 and 2007.
In 2012, plaintiffs commenced this action accusing Citigroup of defrauding plaintiffs into purchasing “fraudulent [CDO] *139 investments which are now worthless.”[1] In essence, plaintiffs accuse Citigroup of using the CDOs plaintiffs purchased to offload the risk of toxic RMBS on its books and to help preferred clients “short” the housing market. In their complaint, plaintiffs raise causes of action sounding in: (1) fraud; (2) rescission; (3) fraudulent conveyance; and (4) unjust enrichment. Subsequently, Citigroup moved to dismiss the entire action pursuant to CPLR 3211 (a) (7).[2] The motion court granted in part and denied in part Citigroup’s motion, dismissing plaintiffs’ claim for rescission and fraudulent conveyance, while sustaining plaintiffs’ fraud and unjust enrichment claims.[3] Citigroup appeals from the denial of the remaining claims, while plaintiffs appeal from the dismissal of the rescission claim.
We first examine Citigroup’s contentions. With regard to the fraud claim, Citigroup argues, inter alia, that it should be dismissed because it is not sufficiently detailed. Generally, in a claim for fraud, a plaintiff must allege “a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury” (Lama Holding Co. v Smith Barney, 88 NY2d 413, 421 [1996]). Furthermore, “the circumstances constituting the wrong shall be stated in detail” (CPLR 3016 [b]; see Lanzi v Brooks, 43 NY2d 778, 780 [1977] [“(CPLR 3016 [b]) requires only that the misconduct complained of be set forth in sufficient detail to clearly inform a defendant with respect to the incidents complained of’]).
*140 In this case, the complaint describes the alleged fraudulent conduct, as to each CDO transaction, as follows:
“From 2000 to 2006, Citigroup earned increasingly large returns from originating subprime mortgages, securitizing them into residential mortgage-backed securities (‘RMBS’), arranging CDOs, and underwriting other structured finance transactions derived from subprime mortgages. When the overheated housing market began to cool in 2006, the market for subprime-based financial products began to decline. Yet Citigroup was accustomed to these profits. In now infamous words, Citigroup’s then-CEO Chuck Prince said in July 2007, literally days before the subprime market collapse, ‘As long as the music is playing, you’ve got to get up and dance,’ and added, ‘We’re still dancing.’
“By early 2007, Citigroup knew that even the most senior tranches of CDOs were far more risky than their ratings suggested. Citigroup’s peculiar knowledge was based on information on individual loan performance that was available only to financial institutions that, like Citigroup, originated subprime mortgages and securitized them into RMBS. As a result of its insider’s knowledge, Citigroup knew that the RMBS it and other major banks were packaging into CDOs included a significant percentage of subprime mortgages that violated basic underwriting standards and were likely to default— making the RMBS assets and the CDOs that rested on them far less secure than portrayed by their ratings. Rather than disclosing these material facts to investors in the deals it arranged, Citigroup concealed them so that it could offload some of the massive exposure to subprime RMBS that Citigroup carried on its own balance sheet to unsuspecting investors — while at the same time continuing to earn lucrative fees from generating CDOs — and used its position to transfer its risk to Plaintiffs and other long investors in Citigroup CDOs.
“Indeed, to continue generating outsized profits in a market that it knew, as an insider, was doomed to collapse sooner rather than later, Citigroup began arranging fraudulent CDOs for its own benefit and *141 for the benefit of certain preferred clients who wanted to ‘short’ the housing market (i.e., to bet that subprime securities would fail). Citigroup also used these CDOs to offload the risk of toxic RMBS and CDO assets that Citigroup carried on its own books by concealing key facts that were peculiarly within its knowledge, while at the same time knowingly misrepresenting to unsuspecting long investors that these assets were of high quality.
“For example, Citigroup colluded secretly with a now-notorious hedge fund known as Magnetar Capital LLC (‘Magnetar’) to create six of Magnetar’s infamous ‘Constellation’ CDO deals in which Magnetar secretly controlled, undisclosed to investors, critical deal features (including the choice of collateral) to further its scheme to profit from short bets against the housing market. Citigroup benefit-ted from this deceptive scheme by reaping tens of millions of dollars in fees. Working closely with Citigroup, Magnetar purchased the hard-to-sell equity tranches of these CDOs [Lacerta] (which carried the most risk) at discounted prices, while using the returns to finance inexpensive short bets against those same CDOs by secretly buying credit protection via credit default swaps (‘CDS’) on those reference portfolios, as well as CDS contracts referencing tranches of the CDOs themselves. As Magnetar and Citigroup expected, the CDS contracts generated substantial net profits for Magnetar when the CDOs failed.
“Citigroup marketed Lacerta, a Constellation CDO, to Plaintiffs as a legitimate long investment opportunity meeting Plaintiffs’ stringent investment requirements, representing that its portfolio was selected ‘solely to create a long investment for equity and mezzanine investors.’ Citigroup did not disclose the material fact that Magnetar — a party that stood to reap massive profits from the collapse of the housing market — was actually dictating the collateral selection criteria and deal structure of Lacerta behind the scenes. Magnetar’s economic interests as a net-short investor were directly adverse to those of long investors like Plaintiffs. Moreover, also unbeknownst to Plaintiffs, Citigroup *142 caused the Lacerta CDO to, in effect, sell CDS contracts to Magnetar at below-market prices. In short, Citigroup helped Magnetar stack the deck in its favor so that Magnetar would win no matter what cards were dealt. None of this was disclosed to Plaintiffs.
“Lacerta was not the only CDO that Citigroup arranged at the behest of a short investor. Like Citigroup, Morgan Stanley & Co., Inc. (‘Morgan Stanley’) purchased subprime loans that it packaged into RMBS for sale to unsuspecting investors. Also like Citigroup, Morgan Stanley learned through nonpublic due diligence reports that a substantial percentage of these loans did not conform to applicable underwriting guidelines, thus rendering the RMBS it was selling much riskier than their credit ratings suggested. Because Morgan Stanley had been unable to sell many of its RMBS directly and needed to offload its exposure to them, it colluded with Citigroup to create the Jackson CDOs — which were purportedly arranged by Citigroup, but were actually constructed by Morgan Stanley to permit it to buy protection on the very toxic securities it had created and could not sell. Citigroup participated in this deception in order to earn lucrative fees for arranging the transaction.”
These factual allegations, which are more fully detailed in the 81-page complaint, provide sufficient details to inform Citigroup of the alleged fraudulent conduct. As indicated, the gravamen of the complaint is essentially that Citigroup secretly selected .its riskiest mortgages for sale to its investors as CDOs and purchased credit default swaps to short the issuance. The complaint also alleges that Citigroup used a similar scheme to help preferred clients offload the risks of toxic RMBS from their books.
While the complaint fails to specify dates as to many of the relevant events, and fails to mention the Citigroup employees who were involved in these activities that comprised the fraudulent scheme, under the circumstances here, where the facts were generally “peculiarly within the knowledge of the party against whom the [fraud] is being asserted” (Jered Contr. Corp. v New York City Tr. Auth., 22 NY2d 187, 194 [1968]), the misconduct complained of is set forth in sufficient detail to *143 apprise Citigroup of the alleged wrongs. Given that the allegations must be given their most favorable intendment (Arrington v New York Times Co., 55 NY2d 433, 442 [1982], cert denied 459 US 1146 [1983]), “it would be impossible for the plaintiff[s] to state the circumstances in more detail because, if the allegations are true, only [Citigroup] would have knowledge of the details” (Grumman Aerospace Corp. v Rice, 196 AD2d 572, 573 [2d Dept 1993]).
Citigroup, however, argues alternatively that plaintiffs cannot establish the element of reasonable reliance (an element of both affirmative misrepresentation and concealment) as a result of the disclosures and disclaimers contained in the offering circulars for the securities that plaintiffs purchased. As plainly explained by this Court in Basis Yield Alpha Fund (Master) v Goldman Sachs Group, Inc. (115 AD3d 128, 137 [1st Dept 2014] [citations omitted]),
“The law is abundantly clear in this state that a buyer’s disclaimer of reliance cannot preclude a claim of justifiable reliance on the seller’s misrepresentations or omissions unless (1) the disclaimer is made sufficiently specific to the particular type of fact misrepresented or undisclosed; and (2) the alleged misrepresentations or omissions did not concern facts peculiarly within the seller’s knowledge. Accordingly, only where a written contract contains a specific disclaimer of responsibility for extraneous representations, that is, a provision that the parties are not bound by or relying upon representations or omissions as to the specific matter, is a plaintiff precluded from later claiming fraud on the ground of a prior misrepresentation as to the specific matter. In other words, in view of the disclaimer, no representations exist and that being so, there can be no reliance.”
In this case, Citigroup claims that the disclaimers and disclosures in the offering circulars are sufficiently specific to the particular information that was either misrepresented or undisclosed. First, Citigroup points out that the offering circulars required the purchasers to disclaim reliance on “the advice or recommendations of or any information, representation . . . provided by [Citigroup] or any of its affiliates” and concomitantly acknowledge that they have “determined (independently and without relying on [Citigroup] or any of its affiliates) . . . *144 that [they are] financially able to bear such risks that [the] investment” entails. Secondly, Citigroup points out that the offering circulars disclosed that the collateral will be subject to various types of risks associated with RMBS, “including, among others, credit risks, liquidity risks and interest rate” risks. Thirdly, Citigroup points out that the offering circulars disclosed that Citigroup and its affiliates “may be acting in a number of capacities,” that the “roles played by [Citigroup and its] affiliates may, at times, conflict with the interest” of the purchaser, and that “the decisions made by such entities may prejudice (possibly materially) the interests of . . . the Noteholders.”
We find that these disclaimers and disclosures fall well short of tracking the particular misrepresentations and omissions alleged by plaintiffs. Indeed, the disclaimers here are strikingly similar to the disclaimers at issue in Basis Yield and which this Court found did not sufficiently track the particular omissions and representations alleged in that case (Basis Yield, 115 AD3d at 138).
Initially, it should be noted that the fraudulent misrepresentations and omissions alleged here are indistinguishable from those alleged in Basis Yield. In that case, like here, an investment fund purchased CDOs that were linked to the performance of RMBS {id. at 131). Again, as alleged here, the seller of the bonds, an investment bank, deliberately included its riskiest assets in that package of mortgages; at the same time, the seller “shorted” the bonds by purchasing credit default swaps that would pay off if the bonds turned out to be unprofitable {id. at 137-138). As part of the purchase agreement, the seller, like Citigroup here, included very strongly-worded disclaimers and disclosures about the inherently risky nature of mortgage-backed bonds, that the purchaser would conduct its own due diligence, and revealing that the seller would be purchasing credit protection as a hedge {id. at 131). When the housing market collapsed, the fund lost almost $70 million {id. at 131-132). It then brought suit against the seller, claiming fraud {id.). The seller moved to dismiss on the basis of the disclaimers and disclosures, arguing that the purchaser could not have relied on the seller’s alleged misrepresentations. The motion court denied the motion to dismiss, and this Court affirmed.
Specifically, Basis Yield found that the seller’s disclaimer regarding the inherently risky nature of mortgage-backed bonds did not encompass the secret risk that the seller had deliberately selected the riskiest assets:
*145 “[The seller] structured, marketed and sold the . . . CDOs with the intent of reducing its long term exposure to subprime risk by betting against them. The complaint further alleges that [the seller] not only knew that it was selling toxic assets (based upon [the seller’s] internal valuation of the securities and its involvement in the underlying asset selection process) to its clients and failed to disclose those sales to investors, but that [the seller] also sought to profit from its own actions. Yet, the . . . disclosures simply provide boilerplate statements regarding the speculative and risky nature of investing in mortgaged-backed CDOs and the possibility of market turns. If plaintiff’s allegations are accepted as true, there is a ‘vast gap’ between the speculative picture [the seller] presented to investors and the events [the seller] knew had already occurred” (id. at 138).
Secondly, the seller in Basis Yield argued that it had disclosed that it was purchasing credit protection, thus indicating to the buyer, like Citigroup did here, that there was a potential conflict of interest (since the credit protection was a potential source of profit in the event of a shortfall in the bonds) (id.). But Basis Yield held that these disclosures did not reveal that the seller had deliberately sabotaged the bond issuance so as to profit from the credit default swaps:
“[The purchaser] is alleging more than the fact that [the seller] was a mere ‘contrarian’ looking to capitalize on over-priced long [mortgage] bets that would be unprofitable when the housing prices collapsed, contrary to the general belief at the time that prices would continue to perpetually rise . . . [The purchaser] claims that [the seller] had more than a profit motive . . . [The purchaser] claims that [the seller] not only structured, marketed and sold [these bonds], but that it did so with the intent to rid itself of long term exposure to subprime mortgages, and to profit by selling them to its clients and betting against its own long term position” (id. 138-139).
Moreover, Basis Yield found that even if the disclosures had been facially sufficient, the purchaser’s allegations were sufficient to withstand a motion to dismiss because of the seller’s “peculiar knowledge” of secret information that was unavailable to the purchaser:
*146 “[The purchaser] alleges that because of what [the seller] knew from its role as an underwriter and because of what the mortgage investigations conducted on its behalf . . . revealed, [the seller] had access to nonpublic information regarding the deteriorating credit quality of subprime mortgages. These allegations are supported by quotes from [the seller’s internal] documents, complete with dates and names, expressing derogatory remarks about the CDOs. These allegations are more than adequate to allege the peculiar knowledge exception to the disclaimer bar” {id. at 139).
Our recent pronouncement in Basis Yield, therefore, constitutes clear precedent that compels us to find that Citigroup’s disclaimers and disclosures do not preclude, as a matter of law, a claim of justifiable reliance on the seller’s misrepresentations or omissions, as an element of fraud. The cases relied upon by Citigroup, namely, this Court’s recent pronouncements in ACA Fin. Guar. Corp. v Goldman, Sachs & Co. (106 AD3d 494 [1st Dept 2013], appeal dismissed 22 NY3d 909 [2013]) and HSH Nordbank AG v UBS AG (95 AD3d at 185), do not mandate a different result.
In ACA Financial, the plaintiff issued a guaranty on a CDO investment in reliance on the defendants’ representation that Paulson, the “transaction sponsor” who would be picking the CDO’s collateral, would purchase the “first loss tranche” (i.e., the equity) and would therefore have interests aligned with those of long investors (106 AD3d at 496-497). The plaintiff alleged that the defendants misrepresented and concealed that, in reality, Paulson had a short position on the CDO, did not hold the first loss tranche, and had adversely selected the CDO’s portfolio. ACA Financial’s finding that the plaintiffs reliance on the defendant’s alleged representation was not reasonable was predicated on this Court’s determination that the transaction documents specifically disclosed the information that the plaintiff alleged was concealed {id. at 496 [“plaintiff received, inter alia, the offering circular for the transaction, which expressly discloses that no one was investing in the first-loss tranche”]). Thus, ACA Financial reasoned, this disclosure “should have alerted plaintiff,” who then “should have questioned” the defendants or Paulson, which “would have likely informed plaintiff that [Paulson] was taking a short rather than the long equity position represented” {id. at 496-497).
*147 The allegations here are fundamentally different. In the case of the Lacerta CDO, for example, plaintiffs allege that Citigroup actively concealed Magnetar’s identity and control over collateral selection as well as its massive short positions. Citigroup has not established that anything in the deal documents or elsewhere could have “alerted” plaintiffs to the falsity of Citigroup’s representations that the deal’s portfolio had been selected by the equity investor (i.e., a long investor) “solely to create a long investment.” Moreover, in four of the other five CDO transactions at issue (Pinnacle Peak, Plettenberg Bay, Cookson, and ABSynth), there were — as the trial court correctly found — no “red flags” or “alarm bells” in the deal documents or elsewhere that could have alerted plaintiffs to Citigroup’s purported fraud. With respect to the other CDO, Jackson, where the offering documents did raise a red flag, plaintiffs took precisely the action prescribed by ACA Financing: they conducted additional due diligence, but Citigroup allegedly provided plaintiffs with inaccurate information, “falsely claiming that its CDS customer was a hedge fund that wanted to hedge its exposure to certain investments, not an investment bank that wanted to unload risk it was unable to sell in the market.”
Similarly unavailing is Citigroup’s reliance on Nordbank. Nordbank involved a plaintiff, HSH, that entered into a credit default swap with the defendant, UBS, in which the plaintiff assumed the risk of losses on a $2 billion portfolio of mortgage-backed securities related to the U.S. market. Nordbank is inapposite here for two significant reasons.
First, unlike here, in Nordbank the disclaimers and disclosures were sufficiently specific to the particular type of information allegedly misrepresented. In Nordbank “the core subject of the complained-of representations was the reliability of the credit ratings used to define the permissible composition of the reference pool” {Nordbank, 95 AD3d at 196). Yet, the disclaimers and disclosures “relate[d] directly or indirectly to the reliability of credit ratings in the relevant market” {id. at 199). Thus, in view of the disclaimer, Nordbank held that no representation existed, and there could not have been any reliance {id.).
Secondly, Nordbank found that the alleged misrepresentation did not concern facts peculiarly within the seller’s knowledge. This is because the reliability of the credit ratings could have been ascertained from reviewing market data or other publicly available information {id.). In fact, the allegations of the *148 complaint itself established that HSH could have uncovered any misrepresentation of the risk of the transaction through the exercise of reasonable due diligence within the means of a financial institution of its size and sophistication (id,.).
Here, by contrast, Citigroup has not presented documentary evidence to undermine plaintiffs’ allegations that it was not “common knowledge” that Citigroup was creating CDOs as vehicles for it and others to short adversely selected collateral. Moreover, unlike the situation in Nordbank, plaintiffs here specifically plead that the facts comprising the fraud were peculiarly within Citigroup’s knowledge and that plaintiffs could not have discovered this information despite their reasonable due diligence. Thus, as the motion court correctly found, plaintiffs here allege a scheme that no investor, “sophisticated or not,” could have discovered.
We find, however, that the unjust enrichment cause of action should have been dismissed because the CDO transactions were governed by written agreements. “The theory of unjust enrichment is one created in law in the absence of any agreement” (Basis Yield, 115 AD3d at 141; see also Goldman v Metropolitan Life Ins. Co., 5 NY3d 561, 572 [2005]). Finally, contrary to plaintiffs’ contention, the motion court properly dismissed the rescission cause of action because the complaint fails to allege the absence of a “complete and adequate remedy at law” (see Rudman v Cowles Communications, 30 NY2d 1, 13 [1972]).
Accordingly, the order of the Supreme Court, New York County (Jeffrey K. Oing, J), entered December 6, 2012, which, insofar as appealed from as limited by the briefs, denied the motion of defendants Citigroup Global Markets Inc. (CGMI), Citibank, N.A., and Citigroup Global Markets Limited (CGML) (defendants) to dismiss the unjust enrichment claim as against them and the fraud claims as against CGMI and CGML, and granted their motion to dismiss the rescission claim as against CGMI and CGML, should be modified, on the law, to grant the motion to dismiss the unjust enrichment claim against said defendants, and otherwise affirmed, without costs.
Mazzarelli, J.E, Sweeny, Freedman and Gische, JJ., concur.
Order, Supreme Court, New York County, entered December 6, 2012, modified, on the law, to grant the motion to dismiss the unjust enrichment claim against said defendants, and otherwise affirmed, without costs.

. The defendants here are Citigroup Global Markets Inc., Citibank, N.A., and Citigroup Global Markets Limited. They are collectively referred to here as Citigroup.

. Citigroup moved pursuant to CPLR 3211 (a) (7) but has submitted documentary evidence allegedly refuting plaintiffs’ fraud allegations. Such allegations will be accepted as true unless refuted by documentary evidence. “When documentary evidence is submitted by a defendant ‘the standard morphs from whether the plaintiff stated a cause of action to whether it has one’ ” (Basis Yield Alpha Fund [Master] v Goldman Sachs Group, Inc., 115 AD3d 128, 135 [1st Dept 2014]), quoting John R. Higgitt, CPLR 3211 [a] [1] and [a] [7] Dismissal Motions—Pitfalls and Pointers, 83 NY ST BJ 32, 33 [Nov./Dec. 2011]; John R. Higgitt, CPLR 3211 [a] [7]: Demurrer or Merits-Testing Device?, 73 Alb L Rev 99, 110 [2009]). Thus, “if [Citigroup’s] evidence establishes that the [plaintiffs] [have] no cause of action (i.e., that a well-pleaded cognizable claim is flatly rejected by the documentary evidence), dismissal would be appropriate” (id.).

. The motion court also rejected plaintiffs’ claim for punitive damages.